929 A.2d 958

**FRATERNAL ORDER OF POLICE MONTGOMERY COUNTY LODGE 35, INC. et al.**

v.

**J. Thomas MANGER et al.**

No. 1280, Sept. Term, 2006.

Court of Special Appeals of Maryland.

May 25, 2007.

Reconsideration Denied Sept. 13, 2007.

478

480

Martha L. Handman of Gaithersburg, MD and James F. Shalleck of Montgomery Village, for appellant.

Karen L. Federman Henry (Edward G. Lattner, Marc P. Hansen, Acting County Attorney on the brief), Rockville, for appellee.

DAVIS, KRAUSER and BARBERA, JJ.

DAVIS, J.

Appellant John Doe,[1] a sworn officer in the Montgomery County Police Department (MCPD), is facing administrative charges which are to be heard by an alternative administrative hearing board (Board) pursuant to 3–107 of the Law Enforcement Officers' Bill of Rights (LEOBR).[2] Md.Code, Public Safety § 3–101 through § 3–113.[3] Before the Board convened, Doe filed pre-hearing motions to suppress evidence and to sever the charges. On December 23, 2005, the Board declined to rule on the motions, stating that it lacked authority to interpret constitutional and state statutory provisions.

On December 28, 2005, Doe and appellant, Fraternal Order of Police, Montgomery County Lodge 35, Inc. (FOP), brought suit against appellees J. Thomas Manger and the MCPD in the Circuit Court for Montgomery County pursuant to LEOBR § 3–105, seeking to require the Board to consider and rule on Doe's pre-hearing motions to sever the charges and suppress evidence. In the alternative, appellants requested that the court order that the charges be severed and the evidence suppressed. The circuit court issued a show cause order on December 28, 2005.

On January 10, 2006, appellants filed an amended complaint and, on February 6, 2006, they filed a motion for summary judgment. After hearing argument on April 17, 2006, the

---

1. To protect appellant's identity, he is hereinafter designated as "John Doe" or "Officer Doe." We shall also denote the officer hereinafter in the singular, i.e., "appellant", and the Fraternal Order of Police and the officer, collectively, in the plural, i.e., "appellants."

2. Appellant's administrative charges are contained in "IAD case 04–0070–FI that the circuit court stayed pending the resolution of the show cause order discussed infra."

3. We shall hereinafter refer to Title 3 of the Public Safety Article as LEOBR and, unless otherwise indicated, to Md.Code Ann., Pub. Safety (2003, 2006 Supp.).

motions judge[4] denied the Motion for Summary Judgment, but did not enter judgment.

When the parties appeared for trial on the Petition for Show Cause Order on May 25, 2006, the trial judge found that the matter was "moot" because of findings that the motions judge had made at the hearing on the Motion for Summary Judgment. The trial judge directed the parties to submit an order to the motions judge, which they did. On July 6, 2006, the motions judge issued an order, which was entered on July 13, 2006, denying appellant's motion for summary judgment and ordering judgment for appellees.

Appellants timely appealed to this Court, presenting the following issues for our review:

I. Whether the trial judge erred by denying appellants a trial when no judgment had been entered after the motions judge denied their motion for summary judgment.

II. Whether the motions judge and the trial judge denied appellants the right to present evidence by failing to review the evidence they had submitted in support of their motion for summary judgment and by subsequently denying them the opportunity to present evidence at a trial.

III. Whether the motions judge erred by ordering summary judgment for appellees, when the undisputed material facts gave rise to conflicting inferences.

IV. Whether the MCPD violated the Fourth Amendment and Article 26 of the Maryland Declaration of Rights when its officers, in the absence of a warrant or an exception to the warrant requirement, seized Doe's files from his home.

V. Whether the motions judge erred in deciding that Doe voluntarily produced his files, when he gave the files to MCPD officers pursuant to an express order by his commander to produce them from his home immediately and under threat of disciplinary action.

---

4. For clarity, we shall refer to the April 17, 2006 judge as the "motions judge" and the May 25, 2006 judge as the "trial judge."

VI. Whether evidence that the MCPD illegally seized from Doe's home and evidence derived from the illegally seized evidence is admissible against him at an administrative hearing conducted pursuant to LEOBR § 3–107.

VII. Whether the motions judge erred in failing to order severance of administrative charges against Doe, when those charges were based on seven separate, unrelated incidents which had occurred over a six month period, and each incident involved the arrest of a different individual.

VIII. Whether the MCPD violated Doe's LEOBR rights when its officers interrogated him about his files.

For the reasons that follow, we conclude that a determination of whether the LEOBR was triggered by an investigation was never an issue presented to the trial court, that the recovery of police files from appellant's residence did not violate Fourth Amendment proscriptions against unreasonable seizures and that the court did not abuse its discretion in refusing the request of appellant's counsel to present argument on his motion for severance *ex parte* or to discuss the basis of his motion with the court in private. Accordingly, we shall affirm judgment of the circuit court.

## FACTUAL BACKGROUND

On or about July 18, 2004, the MCPD's Internal Affairs Division (IAD) received a complaint from a woman whom Doe had arrested in June 2004 for alcohol-related driving offenses and IAD opened a formal investigation. The crux of the complaint was that Doe had taken photographs of the defendant's upper and lower body when he processed her following her arrest. On August 19, 2004, IAD investigators Sergeant Teena Lee and MPO Anthony M. Chuckerel went to the Bethesda District Station to obtain Doe's case files. Their purpose was to obtain photographs of women that Doe had arrested. After they searched a file cabinet at the station without finding any of Doe's case files, they assumed that the files were either in Doe's cruiser or at his home and notified Captain Darryl McSwain, the TAD director. At Captain

McSwain's direction, Commander Betsy Davis, the commander of the Bethesda District, then issued a written "Administrative Order" to Doe, which stated:

> This is a direct order to produce all case files pertaining to all arrests that you have made in the last twenty[-]four months (August 2002–August 19, 2004) in their entirety to include police reports, photographs, tickets/citations, notes and any file evidence.

> You are hereby ordered to produce these items immediately, without any delay to myself. Failure to comply with this order may result in disciplinary action against you as a result of failing to obey a direct order which is in violation of Department Rules, Function Code 300, Rule 3A.

At approximately 6:30 p.m., Doe's immediate supervisor, Sergeant Cathleen Lapsley, contacted him on the road and directed him to report to the Bethesda District station. When he arrived, Sergeant Lapsley, Commander Davis, Sergeant Lee and Officer Chuckerel were waiting for him in the parking lot. They escorted Doe to a conference room where Commander Davis told Doe that IAD was investigating him. She then delivered the written "Administrative Order" to Doe, immediately thereafter reading it out loud and telling Doe that, if he failed to produce the files immediately, he would be charged with failing to obey a lawful direct order. Commander Davis asked Doe where his case files were and was told that they were at his home. Commander Davis, Sergeant Lapsley and the two IAD detectives then accompanied Doe to the evidence room where he obtained some boxes, after which Commander Davis advised Doe that the case files would have to be retrieved immediately from his house.

Commander Davis directed Doe to drive to his house in his cruiser accompanied by Sergeant Lapsley. Commander Davis followed them in her police vehicle and the two IAD detectives followed. Inside his condominium, Doe retrieved the files from a cabinet and, with Sergeant Lapsley's assistance, boxed them up, carried them outside and counted them. Sergeant Lee recorded the number of boxes retrieved—three boxes

which contained a total of 183 case files. After the boxes were placed in Sergeant Lee's car and a receipt for them was given to Doe by Commander Davis, the IAD detectives left with the files and Sergeant Lapsley told Doe to go back in service.

After retrieving the case files, IAD investigators searched the files for evidence of wrongdoing. They examined the file contents and used information in the files to identify and contact women Doe had arrested. This investigation ultimately resulted in a five-count administrative charge against Doe for which the MCPD is seeking his dismissal.

On July 14, 2005, after the investigation concluded, Doe was charged with violating the five administrative rules. These charges emanated from seven arrests that occurred between January 8, 2004 and June 8, 2004 and were based on evidence from the files, as well as on information derived from that evidence.

Each of the seven incidents which gave rise to the administrative charges against Doe occurred on a different date between January 8, 2004 and June 8, 2004 and involved the arrest of a different individual at a different location. According to IAD Officer Chuckerel, none of these defendants was a witness to any of the incidents that gave rise to the administrative charges related to the other defendants. "They were all separate." [5]

Allegation 1, which arose out of Doe's arrest of subject No.7 on June 8, 2004, accuses Doe of violating department directives in connection with the storage of false identifications cards he had seized. That is the only allegation arising out of this arrest.

Allegation 2 accuses Doe of violating department directives by failing to search subject No. 5, subject No. 2, subject No. 4, and subject No. 1 before transporting them following their arrests on March 29, 2004, February 12, 2004, March 20, 2004 and January 8, 2004, respectively.

---

5. We refer to the alleged victims in chronological order from date of arrest and number them numbers one through seven, respectively.

Allegation 3 accuses Doe of violating department directives by escorting subject No. 2, subject No. 3, and subject No. 6 to the restroom on February 12, 2004, March 6, 2004 and April 9, 2004, respectively.

Allegation 4 accuses Doe of violating the department rule on courtesy by making a rude comment to subject No. 5 on March 29, 2004.

Allegation 5 accuses Doe of a variety of inappropriate comments and actions in connection with his arrests of subject No. 2 on February 12, 2004, subject No. 4 on March 20, 2004, subject No. 1 on January 8, 2004, subject No. 3 on March 6, 2004 and subject No. 6 on April 9, 2004.

The punishments sought by MCPD were set forth as follows:

Allegation # 1: Letter of Reprimand

Allegation # 2: Forty (40) Hours Suspension Without Pay

Allegation # 3: Eighty (80) Hours Suspension Without Pay

Allegation # 4: Letter of Reprimand

Allegation # 5: Dismissal.

Pursuant to LEOBR § 3–107(a), Doe demanded a hearing before an alternate administrative hearing board. On December 13, 2005, Doe filed two pre-hearing motions with the Board: a motion to sever charges and a motion to suppress evidence. The MCPD filed an Answer dated December 21, 2005, which argued that the Board lacked authority to interpret the federal and state laws at issue. On December 23, 2005, the Board declined to rule on the motions and remanded them "for submission to an appropriate forum" because "[r]ulings on the Motions would necessarily involve the interpretation of Constitutional and Statutory provisions and are appropriately addressed in advance of the hearing by a State Court of General jurisdiction." Appellees thereafter filed a Petition for Show Cause Order followed by a Motion for Summary Judgment. The hearing on the motion for summary judgment was held prior to the hearing on the petition for show cause order.

Just prior to issuing his ruling at the hearing on the motion for summary judgment, the motions judge stated that the only exhibits he had received from the court clerk were the first seven attachments to the complaint. The judge found that Commander Davis' order to Doe to produce his files was proper, reasonable and not coercive, that Doe's compliance was voluntary and that the MCPD had probable cause to ask for the information. Whether the matter should be tried separately or together was determined by the motions court to rest, not upon the competency of the Board, but upon the nature of the administrative charges.

After reviewing the administrative charges against Doe, the motions judge opined that there was a prejudicial overlap and the charges, in his opinion, should not be severed because "that very specific overlap" was part of the "overall charge against the officer." Nevertheless, the judge clarified that this opinion was without prejudice to appellants' right to raise the severance issue with the Board and left the issue "to the board to sort out."

The court issued the following ruling in denying appellants' motion for summary judgment.

All right, what's before the [c]ourt is to determine whether or not the—it's actually a motion for summary judgment based on the [appellants'] position that the search was an unconstitutional search and, therefore, the fruits of that search cannot be used against him in an administrative procedure, and that if it is granted that the—not suppressed, that the matters should be tried as seven separate offenses rather than one.

The [c]ourt has listened carefully to argument. It's an interesting issue, but I believe that the action of the department in requesting the case files was a lawful order, that was complied with by the officer in question delivering the records to the officer who had accompanied him inside—one of the Internal Affairs Division officers.

And so, therefore, the [c]ourt does not believe that the order was coercive or that the options available to the

officer were not appreciated one way or the other. It seems clear to me that the officer had the opportunity to do what he wanted to do and, at least, to think about it. It was not an instantaneous decision, but there is some—I do have some reservation in that the directive said, or you may suffer—may suffer administrative sanctions, if you don't comply. People take that different ways, but I think the directive was proper. I think it was reasonable and I think that's the key here, whether this was reasonable or unreasonable, and I think that there was probable cause for the department to ask for the information, and it was delivered, as I take it, voluntarily. So, not having found it to be coercive, I refuse to suppress the search.

Secondly, whether the matter should be tried together or separately, I don't think rests on the competency on the trial board, but rather the nature of the charges. But, I do find that the charges, as presented, are such that one trial board should hear all of the charges. There is no question in my mind that there's an overlap that is prejudicial, but it is essentially that very specific overlap that is part of the basis of the overall charge against the officer. So, I*m going to leave that to the board to sort out, but the [c]ourt believes that severance should not be granted. But, I will say that that's without prejudice to the [appellants], to raise the issue with the board if they feel it's appropriate to do so.

[Appellants' counsel]: Your Honor, may I ask—

THE COURT: Yes.

[Appellants' counsel]: In our briefs and in our motion, we raised, on the severance issue, we did raise that the—that a joinder would impair our ability to defend the charges together and we have not discussed that issue at all. That was discussed in the brief and in the motion and the—and I would ask the [c]ourt to take a look at that issue because that is yet another prejudice that the courts have recognized. And, preparing separate defenses—there's no conflict of separate defense in preparing one defense for all these separate charges, it does create a conflict in doing that, and the Court has not addressed that issue.

THE COURT: Where does that appear, in your initial brief?

[Appellants' counsel]: Yes.

* * *

THE COURT: Well, you say it's confounded, but that's a broad assertion. I don't understand why the defense would be inconsistent if he—basically, it seems to me that the defense is (A) none of this happened, or (B) it was misunderstood, or (C) it's a hybrid of some of the above.

[Appellants' counsel]: Your Honor, I would be happy to tell you in chambers how—the details of how our defense would be impaired, but I have no requirement under law to disclose the defense to counsel or in the presence of counsel, and I think that would be prejudicial to our case—

THE COURT: I'm not going to take any *ex parte* in-chamber's conference—

[Appellants' counsel]: But, I can tell you, as an officer of the court, that it would—there is significant problem for us, and conflicting defenses.

THE COURT: Well, I'm going to deny your motion at this point. I don't doubt your position as an officer of the court, but that doesn't necessarily mean that it's correct in law. So, at this point, you will have to think about what you want to do.

*So, accordingly, the motion for summary judgment is denied.*

(Emphasis added.)

When the parties appeared for trial on May 25, 2006, the trial judge concluded that the determinations of the motions judge were binding. The trial judge found that the case was "moot" based on the fact that the motions judge had made findings on the issues. Appellants informed the trial judge that the motions judge did not enter judgment and that they wanted to present a complete factual record because, in their opinion, the motions judge did not have their exhibits prior to denying their motion for summary judgment, and that they

wanted to present additional evidence. Additional facts will be provided as warranted.

## LEGAL ANALYSIS

## I

## SUMMARY JUDGMENT

■ Appellants' first question for the Court addresses whether the trial court had to entertain appellants' "Amended Petition for Show Cause Order Under the Law Enforcement Officer's Bill of Rights." We have held that, according to Maryland law, the law of the case doctrine applies to decisions that finally dispose of the case. *Warfel v. Brady*, 95 Md.App. 1, 6, 619 A.2d 171 (1993) (quoting *Ralkey v. Minn. Mining & Mfg. Co.*, 63 Md.App. 515, 521, 492 A.2d 1358 (1985)). " 'There is no decision or statute which requires one *nisi prius* judge to accept as final and conclusive the decisions on the law before trial of another judge or court.' " *Placido v. Citizens Bank & Trust Co. of Md.*, 38 Md.App. 33, 45, 379 A.2d 773 (1977) (quoting *Nat'l Liberty Ins. Co. of Am. v. Thrall*, 181 Md. 19, 22–23, 27 A.2d 353 (1942)).

■ In the instant case, the trial judge had the discretion to consider the matter *de novo* unless prohibited by statute or rule. *Ralkey*, 63 Md.App. at 521, 492 A.2d 1358 (and citations therein). Appellants contend that the trial court's conclusion that the issues were moot is erroneous because the trial court could have granted relief. Neither appellants nor appellees cite any law to support the proposition that the trial judge was required or not required to adopt the motions judge's findings as to the issues addressed in the motion for summary judgment. Although not moot, the motions court's findings could be adopted by the trial judge. In *Ralkey*, we held that the trial judge was not required to deny a motion for summary judgment previously brought by the same party and denied in a sister court. *Ralkey*, 63 Md.App. at 523, 492 A.2d 1358. Thus, the trial judge was not required to rule on the issues

previously argued before the motions judge and did not deny appellants the right to present evidence.

Appellants argue that the motions judge and trial judge denied appellants the right to present evidence because the motions judge denied the motion for summary judgment without having considered documents submitted in support thereof. We agree as to the motions judge.

When the motions judge questioned appellees as to the statement of charges that Doe wished to inspect, the following exchange took place:

THE COURT: Is that in the record?

* * *

[Appellants' counsel]: Your Honor, They are on Exhibit A of [appellants'] motion for summary judgment.

THE COURT: Oh, motion for summary judgment—

[Appellants' counsel]: You'll find them in there.

THE COURT: You know what, I don't have the attachments.

[Appellants' counsel]: You didn't get the attachments?

THE COURT: No.

* * *

THE COURT: I have the motion only, and then I have the first seven attachments to the complaint. I assume it's not in that, I'm looking now. I'd like to see the charging document.

The foregoing exchange indicates that the motions judge could not have considered the evidence presented by appellants before denying the motion for summary judgment.

■ The right to present evidence is essential to fulfill the requirements of the Due Process Clause of the United States Constitution. *Jenkins v. McKeithen,* 395 U.S. 411, 429, 89 S.Ct. 1843, 1853, 23 L.Ed.2d 404 (1969) (citing *Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938); *B & O R.R. Co. v. United States,* 298 U.S. 349, 368–69,

56 S.Ct. 797, 807, 80 L.Ed. 1209 (1936)). Our review of the record reveals that appellants submitted the motion on February 6, 2006, together with attachments. The record is clear that the attachments were not submitted to the motions judge and, therefore, he could not have considered them before his oral ruling.

■ Although the oral findings, as set forth *supra*, do not in any respect grant summary judgment to appellees, the motions judge, by his order, granted summary judgment to appellees. A court may grant summary judgment to the non-moving party absent a cross-motion for summary judgment. *Cotillo v. Duncan*, 172 Md.App. 29, 50, 912 A.2d 72 (2006). The order signed by the motions judge on July 6th, and entered July 13, 2006, stated:

> Upon consideration of the Motion for Summary Judgment of [appellants] and the opposition thereto, it is on this 6th day of July, 2006 hereby
>
> ORDERED, that the [appellants'] motion be and the same is hereby DENIED; and it is further
>
> ORDERED that *judgment be entered for [appellees]* in accordance with the [c]ourt's oral findings on the record on April 17, 2006.

(Emphasis added.)

Notwithstanding that the motions judge never considered evidence appellants sought to submit on the motion for summary judgment, we are satisfied that the court's failure should not have been fatal to appellant's motion. We explain.

We review the grant of summary judgment to determine whether the court was legally correct. *Md. Cas. Co. v. Lorkovic*, 100 Md.App. 333, 354, 641 A.2d 924 (1994)(citing *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993)). Because we review the court's grant of summary judgment *de novo*, we must first decide whether a genuine dispute of material fact exists. *de la Puente v. County Comm'rs of Frederick County*, 386 Md. 505, 510, 873 A.2d 366 (2005). "If no such dispute exists, we proceed to review determinations of law[,]" and examine "[t]he facts properly

[brought] before the court, and any reasonable inferences that may be drawn from them [] construed in the light most favorable to the non-moving party." *Id.* (citations and internal quotations omitted).

Despite the fact that they were moving parties, appellants contend that the inferences to be drawn from the facts were conflicting and, as such, should not have been ruled upon in a summary judgment proceeding, but submitted to the trial court in a full hearing on the merits. While it is true, as appellees assert, that there is a measure of inconsistency in Doe's initially "moving for summary judgment based on the absence of a dispute of fact that arguing that a dispute in inferences prevents judgment," we agree with appellees, although to their detriment, that "[their] arguments that follow show that any discrepancy in the inferences from the facts have no bearing on the proper application of the protections of the LEOBR." We further agree with appellees that "the only issues for this court to consider involving whether the department violated Officer Doe's rights under the LEOBR based on the request for the files or by combining the charges against the officer for hearing." And, although we also agree with appellees that ". . . any alternative inferences from the undisputed facts have no effect on the outcome of the petition for show cause," we differ in our view as to the legal result which should flow from the undisputed facts and inferences deducible therefrom.

Summary judgment is not appropriate where undisputed facts are susceptible to multiple inferences. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985) (Where several inferences may be drawn, summary judgment must be denied and the dispute submitted to the trier of fact). In a footnote in their brief, regarding their claim that there were no first level material facts in dispute, appellants point out that the motions judge failed to state whether any material facts were in dispute and the factual basis for denying the motion for summary judgment. Because of the court's failure to so find, they say, it cannot be determined whether the judge regarded ownership of the files as of material fact. Appellants further

assert that the court erred "by choosing among conflicting inferences in its determination of the ultimate constitutional facts regarding the reasonableness of the seizure, the legality of Davis' order, the voluntariness of Doe's compliance and the severance of the administrative charges." We see it differently.

At the outset, the court's failure to consider evidence submitted by appellants on the motion for summary judgment is of no moment in our analysis, *infra.* With respect to the purported "conflicting inferences," the operative word is "material." In our view, the disposition of the issues at hand do not devolve on any perceived inferences from the first level facts developed at the motions hearing. More specifically, we discern no disputed facts, constitutional or otherwise, regarding the reasonableness of the seizure, the legality of Davis' order or the voluntariness of Doe's compliance. And, we are further unable to discern the asserted conflicting inferences which may be drawn from what appellants denominate as "constitutional facts." Rather, we are satisfied that the reasonableness of the seizure, the legality of Davis' order and the voluntariness of Doe's compliance are legal issues that should have been decided by the motions court, based on the undisputed facts before it.

## II

## LEOBR

### A.

■ The LEOBR was enacted to assure that certain procedural guarantees [6] would be offered to police officers during an

6. The provisions most relevant to the case at hand are the following: Under Md.Code Ann., Public Safety Article, § 301, subsections (d)(1)(i) through (iii), a law enforcement officer under investigation shall be informed of the name, rank, and command of the law enforcement officer in charge of the investigation, the interrogating officer and each individual present during an interrogation and, under (d)(2), before an interrogation, the law enforcement officer under investigation shall be informed in writing of the nature of the investigation.

investigation or interrogation and any subsequent hearing that could lead to disciplinary action, demotion or dismissal. *Ocean City Police Dep't v. Marshall,* 158 Md.App. 115, 123, 854 A.2d 299 (2004); *Montgomery County Dep't of Police v. Lumpkin,* 51 Md.App. 557, 444 A.2d 469 (1982); *DiGrazia v. County Executive,* 43 Md.App. 580, 584, 406 A.2d 660 (1979), *rev'd on other grounds,* 288 Md. 437, 418 A.2d 1191 (1980).

The procedural safeguards afforded to the officer during the official inquiry into his conduct constitute the heart of the Act's protections. *DiGrazia,* 288 Md. at 453, 418 A.2d 1191 (citing *Abbott v. Admin. Hearing Bd.,* 33 Md.App. 681, 366 A.2d 756 (1976)). An officer is then entitled to a hearing if the investigation results in a recommendation that the officer be disciplined for his conduct. *Id.* (citing *Moore v. Town of Fairmount Heights,* 285 Md. 578, 403 A.2d 1252 (1979)).

The LEOBR is applicable when a law enforcement officer is under investigation by a law enforcement agency as a result of a disciplinary-type complaint lodged against the officer. *Chief, Balt. County Police Dep't v. Marchsteiner,* 55 Md.App. 108, 116, 461 A.2d 28 (1983). The *Marchsteiner* Court held that "[t]here was no interrogation or investigation of any act alleged as a violation of any regulation, ordinance or statute" and, thus, the LEOBR was not applicable. *Id.* (the counseling sessions did not amount to an interrogation or investigation because they were held only to improve Marchsteiner's job performance and not as a disciplinary procedure); *see also Police Dep't v. Day,* 135 Md.App. 384, 762 A.2d 981 (2000) (When a town began its efforts to remove Day, the officer was a law enforcement officer as defined by the LEOBR and entitled to the protection of the LEOBR); *but see Moore,* 285 Md. at 586, 403 A.2d 1252 (a non-permanent officer was not entitled to a hearing under the LEOBR).

The LEOBR covers an officer under any inquiry into his conduct which could lead to disciplinary sanction. *DiGrazia,* 288 Md. at 452, 418 A.2d 1191. From the inception of a departmental disciplinary proceeding, an officer is entitled

to the protection of the LEOBR. *Comm'r, Balt. City Police Dep't. v. Cason,* 34 Md.App. 487, 491, 368 A.2d 1067 (1977).

 Every inquiry does not necessarily implicate the LEOBR. *Calhoun v. Comm'r Balt. City Police Dep't.,* 103 Md.App. 660, 654 A.2d 905 (1995) (annual polygraph examinations not an investigation); *Leibe v. Police Dep't of City of Annapolis,* 57 Md.App. 317, 469 A.2d 1287 (1984) (examination of sick leave records not an investigation).

 Discussing the precursor to the LEOBR, the *Calhoun* Court opined:

> Although § 728(b) addresses an investigation or an interrogation "which could lead to disciplinary action, demotion or dismissal," and § 730(a) addresses an investigation or an interrogation that "results in the recommendation of some action such as demotion, dismissal, transfer, loss of pay, reassignment, or similar action which would be considered a punitive measure," we discern no meaningful difference between the investigation or the interrogation described in these two sections; nor have the cases decided by this Court. *See, e.g., Cancelose,* 75 Md.App. at 666–67, 542 A.2d 1288; *Marchsteiner,* 55 Md.App. at 116–17, 461 A.2d 28; *Town of Westernport v. Duckworth,* 49 Md.App. 236, 244–45, 431 A.2d 709 (1981).

*Calhoun,* 103 Md.App. at 670 n. 9, 654 A.2d 905. Thus, an investigation must precede the application of the rights pursuant to the LEOBR. *Cancelose v. City of Greenbelt,* 75 Md. App. 662, 542 A.2d 1288 (1988) (holding that "[a]t no time was any investigation or interrogation commenced against appellant," the LEBOR was inapplicable).

The Court of Appeals in, *Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling,* 343 Md. 155, 181–82, 680 A.2d 1052 (1996), explained:

> The LEOBR was enacted in 1974, see 1974 Laws, ch. 722, not for the purpose of defining the scope of the Chief's substantive authority, but in order to guarantee that police officers are afforded certain procedural safeguards during any investigation and subsequent hearing which could result

in disciplinary action. See *Moats v. City of Hagerstown,* 324 Md. 519, 526, 597 A.2d 972, 975 (1991) ("The language and history of the Law Enforcement Officers' Bill of Rights demonstrates an intent to establish an exclusive procedural remedy for a police officer in departmental disciplinary matters"); *Andrew,* 318 Md. at 12, 566 A.2d at 759 (citing *Montgomery County Dept. of Police v. Lumpkin,* 51 Md. App. 557, 566, 444 A.2d 469, 473 (1982)) ("In enacting the LEOBR, the legislature sought to guarantee specified procedural safeguards to certain law enforcement officers subject to investigations that might lead to disciplinary actions"); *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 452, 418 A.2d 1191, 1200 (1980)("The legislative scheme of the LEOBR is simply this: Any law-enforcement officer covered by the Act is entitled to its protection during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction."); *Calhoun v. Commissioner, Baltimore City Police Department,* 103 Md.App. 660, 672, 654 A.2d 905, 911 (1995) ("[T]he LEOBR is intended to provide a police officer due process protection . . . when the officer is investigated and/or interrogated as a result of a disciplinary-type complaint lodged against the officer"); *Nichols v. Baltimore Police Department,* 53 Md. App. 623, 626, 455 A.2d 446, 448 (1983) ("The purpose of the LEOBR was to guarantee to those law enforcement officer's embraced therein procedural safeguards during investigation and hearing of matters concerned with disciplinary actions against the officer"); *Abbott v. Administrative Hearing Board,* 33 Md.App. 681, 682, 366 A.2d 756, 757 (1976) ("The purpose of [the LEOBR] was to guarantee that certain procedural safeguards be offered to police officers during any investigation and subsequent hearing which could lead to disciplinary action . . . ."). It is with this purpose in mind that we must determine the meaning and scope of § 731.

### B.

Appellants claim that the LEOBR was applicable at the point when appellant was ordered to report to the station on

August 19, 2004 and questioned as to the location of the arrest files. As indicated, *supra,* the LEOBR requires that "[t]he investigation or interrogation by a law enforcement agency of a law enforcement officer for a reason that may lead to disciplinary action, demotion, or dismissal shall be conducted in accordance with this section." Md.Code Ann., Pub. Safety § 3–104. In response to appellant's assertion that there had been an interrogation when the investigators asked him as to the whereabouts of his files, the following exchange transpired:

THE COURT: When you say he was questioned about his files, at what, specifically, point in time, are you saying he was questioned about the files?

[APPELLANTS' COUNSEL]: He was brought to the station.

THE COURT: Right.

[APPELLANTS' COUNSEL]: Put in the conference room, surrounded by—

THE COURT: Does he have—no, don't give me that.

[APPELLANTS' COUNSEL]: Okay. And, he was asked where are your files—

THE COURT: Files, and he said they're at home.

[APPELLANTS' COUNSEL]: Yeah.

THE COURT: All right. That's what you're seeking to suppress?

[APPELLANTS' COUNSEL]: Then, they went and got them. So, you've got—

THE COURT: Yeah, yeah, okay. Now, whether they have a right, at that point, to request his files is a separate question, but the location of the files, I don't see anything wrong with them asking where his files are.

[APPELLANTS' COUNSEL]: But, the LEOBR also says that an officer—at 3104—says that any officer under investigation shall be informed in writing about the name, rank and command of the person in charge of the investigation. And before any interrogation, any question—interro-

gation to be questioning, he should be informed in writing of the nature of the investigation. He didn't get the right to representation. This—he was bullied into doing this—

THE COURT: Don't characterize it.

[APPELLANTS' COUNSEL]: Okay.

THE COURT: Are you saying that when they said "where are your files?—that that constituted an interrogation of him?

[APPELLANTS' COUNSEL]: Yes.

THE COURT: Okay, that's going to be denied. I've already decided that. I—you know what, if he has police business, the police are entitled to know where his records are. It's not an interrogation of what he did in these cases. That's a whole different question.

[APPELLANTS' COUNSEL]: Okay.

[THE COURT]: And, I assume he has since received written notification of the charges, and who's conducting the investigation. So, I think that's all above-board and dealt with.

██ Asking appellant where the files were located, maintain appellees, did not amount to an investigation and/or interrogation as contemplated by the LEOBR. We agree that appellees had every right to recover the files from appellant and the LEOBR was not implicated by the mere inquiry as to their location. This is particularly true under the circumstances, in light of the fact that the arrangement between Doe and the department was that the originals of the files should have been maintained in the office, in which case the parties agree that there would have been no legal impediment preventing investigating officers from seizing them. Whether an investigation had been launched, on the other hand, is another matter. We explain.

In *Ocean City Police Dept. v. Marshall*, 158 Md.App. 115, 122–23, 854 A.2d 299 (2004), we discussed the safeguards provided for the officer under the LEOBR once an investigation is commenced:

The relevant language currently appears at Md.Code, Public Safety, § 3–104(d)(2) and provides:

Investigation or interrogation of law enforcement officer. * * * (d) Disclosures to law enforcement officer under investigation.-* * * (2) Before an interrogation, the law enforcement officer under investigation shall be informed in writing of the nature of the investigation.

The new language became effective Oct. 1, 2003.

Article 27, Section 728(b) governs the conduct of investigations and interrogations, whenever a law enforcement officer is under investigation or subjected to interrogation by a law enforcement agency, "for any *reason* which could lead to disciplinary action, demotion or dismissal." Subsection (b)(5)(i) requires that the officer be informed of the "nature of the investigation" prior to any interrogation. Upon completion of the investigation, the officer shall be informed of all charges, specifications, and witnesses and shall be given a copy of the investigatory file and any exculpatory information. Section 728(b)(5)(ii) and (iii). An officer is entitled to be represented by counsel during interrogation, and counsel has the right to object to any question. Section 728(b)(10)(i) and (ii). A law enforcement agency may require an officer to submit to interrogations which relate to the subject matter of the investigation, and a refusal to submit may lead to a punitive measure. The results of any such interrogation that occurs, however, are not discoverable or admissible in any subsequent criminal proceeding. Section 728(b)(7)(ii). If the investigation results in the recommendation of punitive action against the officer, the officer has the right to a hearing before a hearing board. Section 730 (now Public Safety section 3–107) governs the conduct of that hearing.

■ Clearly, there must be a threshold investigation or interrogation resulting in a recommendation of punitive action to implicate the LEOBR. *Montgomery County Dep't of Police v. Lumpkin,* 51 Md.App. 557, 566, 444 A.2d 469 (1982); *see also* Md.Code Ann., § 3–104(a), *supra.*

We have defined the ordinary meaning of an investigation as "a detailed examination; a searching inquiry; to observe or study closely." *Calhoun*, 103 Md.App. at 667, 654 A.2d 905 (quoting *Leibe v. Police Dep't of Annapolis*, 57 Md.App. 317, 323, 469 A.2d 1287 (1984) (holding that tracking of sick leave was not an investigation)) (internal quotations and citation omitted). In regard to whether submission to a polygraph examination could be considered an investigation, we held that, at the time an officer was asked to submit to the polygraph, because he was neither under investigation nor interrogated for reasons that could lead to punitive actions, he was not entitled to the protections of the LEOBR. *Widomski v. Chief of Police*, 41 Md.App. 361, 370, 397 A.2d 222, *cert. denied*, 284 Md. 750 (1979). In a similar case, where every officer was required to submit to a polygraph, we held it not to be investigatory or an interrogation as it was less investigative in nature than the polygraph in *Widomski*. *Calhoun*, 103 Md.App. at 670, 654 A.2d 905. We further held that it is apparent that the LEOBR is intended to provide procedural protections only when an officer is "investigated and/or inter-rogated as a result of a disciplinary-type complaint lodged against the officer." *Id.* at 672, 654 A.2d 905. That a complaint that could lead to disciplinary action has been lodged is an implicit assumption. *Id.*

The investigation in this case, which included the files at issue, was initiated after a citizen's complaint had been lodged that could have led to disciplinary actions. The IAD commenced an investigation and, as part of the investigation, Doe was ordered to report to the station and questioned as to the whereabouts of the files.[7] After the investigating officers had searched for the files, without success, in a cabinet at the station, assuming that the files were either in Doe's cruiser or at his home, they notified Captain Darryl McSwain, the TAD

---

7. We need not reach the question of how to preserve files created by officers and stored in private residences. Clearly, in the instant case, the MCPD was interested in maintaining the files' *status quo*, but the problem created by MCPD in allowing officers to take files from the workplace must be addressed by the MCPD.

director. As noted, at McSwain' s direction, Commander Betsy Davis, the commander of the Bethesda District, then issued a written "Administrative Order" ordering production of the files, failure of which would subject Doe to disciplinary proceedings.

Appellants maintain in their appellate brief that the files in question are the property of Doe and, as such, they contended at oral argument before a panel of this Court, that he indeed had the right to destroy them.[8]

Appellant rests his claim that he should have been afforded the protections under the LEOBR on the assertion that an interrogation commenced when he was asked to produce his files. The only reference by appellant's counsel to whether the LEOBR was implicated because of an ongoing investigation was the following: "The LEOBR also says that an officer—at 3104—says that any officer under investigation shall be informed in writing about the name, rank and command of the person in charge of the investigation. And before any interrogation, any question—interrogation or questioning, he should be informed in writing of the nature of the investigation. He didn't get the right to representation. This—he was bullied into doing this—The focus of Doe's position continued to be that it was an interrogation by MCPD that triggered the safeguards of the LEOBR."

---

**8.** We were advised at oral argument that it is the practice of patrolman, like Doe, to keep an official file in the office and a personal or working file at their residences or in their police cruisers, which contain essentially duplicate documents. The reasons for maintaining separate files are that, when scheduled to testify, the officers often go directly to court from their homes or their post and maintaining a duplicate file obviates necessity to make a trip to the office solely for the purpose of obtaining a file. Contrary to the usual practice, *i.e.*, maintenance of a duplicate set of files, the investigating officers found none of Doe's files in his file cabinet located in the office. As will be discussed more fully in Section III, *infra*, counsel for appellants and for appellees, at oral argument before us, agree that, had the investigating officers found the files they sought when they searched the file cabinet located in department headquarters, the seizure of those files would have been legally unassailable.

The court, in response to the issue, doggedly pressed by appellant's counsel, reasoned, "It's not an interrogation of what he did in these cases. That's a whole different question." Significantly, it is the court's next statement that counsel should not have allowed to go unchallenged: "And, I assume he has received written notification on charges, and who's conducting the investigation. *So, I think that's all above board and dealt with.*"

Patently, from the above colloquy, the court believed that there had indeed been compliance with the provisions of § 3–104(d)(1)(i) through (iii) and (2), specifically related to disclosures upon inception of an investigation. The only issue presented by counsel to the motions judge, therefore, was whether, by reason of an interrogation of appellant, the LEOBR was implicated. Undisputedly, a citizen's complaint had been filed and the attempt to recover appellant's files was pursuant to an investigation into those allegations. Equally luminous is that it was contemplated that the IAD's inquiry would ultimately culminate in disciplinary measures. Thus, although a threshold investigation resulting in a recommendation of punitive action, implicating the LEOBR, had been launched, *Montgomery County Dep't of Police v. Lumpkin, supra,* the motions judge found the LEOBR inapplicable on the basis relied upon by appellants, *i.e.,* that the order to produce the files constituted an interrogation. In so ruling, the court did not err.

## FOURTH AMENDMENT

We review the motion court's conclusions of law *de novo,* conducting an independent constitutional appraisal by reviewing that law and applying it to the established facts to determine the validity of a search or seizure. *Muse v. State,* 146 Md.App. 395, 403, 807 A.2d 113 (2002). The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by the government and provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated. . . ." *State v. Green*, 375 Md. 595, 608, 826 A.2d 486 (2003).

 In cases involving a public employer, an analysis of reasonableness can include balancing "the employees' legitimate expectation of privacy against the government's need for supervision, control, and the efficient operation of the workplace." *O'Connor v. Ortega*, 480 U.S. 709, 719–720, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987). The Supreme Court has held that, even absent a search, seizure of property implicates the Fourth Amendment. *Soldal v. Cook County*, 506 U.S. 56, 68, 113 S.Ct. 538, 547, 121 L.Ed.2d 450 (1992).

When officers arrived at the MCPD district station to retrieve the files at issue, they found that the cabinet in which they presumed appellant's files would be located was empty. In regard to where officers keep files that they have created, the following colloquy occurred at the deposition of Captain Betsy Davis:

Q: Do you know if it's common practice for officers to keep case files in their vehicles or at home?

A: Yes.

Q: Is it a common practice?

A: I believe some people do. I mean it's not common, I mean, I think it's the choice. Some people don't keep anything at home, but I do know that I've heard some people have had, you know, case files at their house.

Appellant's immediate supervisor, Sergeant Cathleen Lapsley, testified, "I assumed [the files] were in his file cabinet. I know a lot of officers keep [files] at home as well if they make a lot of arrests because there's usually not room to keep them there." Appellant's counsel argued at trial that

[t]he reason that the seizure was illegal is that the [MCPD] seized files from [appellant's] home without a warrant, and in the absence of an exception to the warrant requirement. Now, (unintelligible) what these files were. These are not the [MCPD's] copies and files. They have reports, citations—they have those in records. These were [appellant's]

copies of reports, citations, copies of citations, his copies of notes, photos that he had taken of people he arrested, so he could remember what they looked like when he went to court, and so he remembered what they were wearing. So, they were his personal files.

* * *

Now, we don't agree with [MCPD] that these files were [MCPD's] property, but the [c]ourt doesn't have to reach that question, because the issue is, did [appellant] have a possessory interest in those files? And he did.

Appellant's counsel then described how the files were retrieved and posited that "[t]hey asked [appellant] where he lived. They then escorted him to his residence. [Appellant] went inside. Sargent Waxley went with him inside. (Unintelligible) in all candor Your Honor. He did ask her to go inside with him because he just wanted her to—*he asked her solely for the purpose of carrying boxes.*" (Emphasis added.)

The MCPD had an ownership interest in the files created by appellant, particularly files of arrests effectuated by appellant. Although his counsel at oral argument referred to the files as "copies of police department documents,"[9] appellant created the files ostensibly while conducting police business. We are satisfied that MCPD's right to view the files is not in dispute and that MCPD therefore was within its authority to demand production of them from appellant. There is no assertion that the order commanded appellant to perform an unlawful act or to do anything that he was not

---

9. In answer to a question posed by a member of the panel of this Court regarding whether the files were "just duplicate files as to what was already in the department," appellant's counsel responded, "For the most part, yes."

 In an attempt to ascertain the ownership status of the files, we asked appellant's counsel if it was her position "that if [the files] had been at [appellant's] office that [MCPD] could have taken [them]—that there would be no problem;" appellant's counsel conceded that "[i]f they had been at a file cabinet in [appellant's] office, yes." Appellees' counsel maintained at oral argument before us that MCPD had "a right to review" the files.

required to do as a law enforcement officer, subject to any order issued by his supervisors in the discharge of his duties. It goes without saying that, irrespective of whether stated in an order, every police officer in the employ of the MCPD is cognizant of the possible disciplinary consequences from failing to comply with a lawful order. Advising appellant that he would be disciplined if the files were not immediately surrendered, therefore, added nothing to the legal efficacy of the order and was therefore superfluous.

 The parties agree that the investigators initially searched the file cabinets at the station in order to locate the files. The investigators went to where the files should have been. Testimony at trial indicated that the MCPD has an arrangement whereby officers are allowed to keep files at their residences for the sake of convenience. Such an accommodation does not extinguish the ownership interest of the MCPD. Had the files been located at the district station, both sides agree that MCPD would have had the right to demand that appellant turn them over or face discipline. Work-related searches are deemed to be merely incident to the primary business and to obtain a warrant would be unduly burdensome. *O'Connor v. Ortega*, 480 U.S. 709, 722, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

 There is a search when " 'an expectation of privacy that society is prepared to consider reasonable is infringed' " and " 'there is some meaningful interference with an individual's possessory interests' " in the property seized. *Maryland v. Macon*, 472 U.S. 463, 468–469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 80 L.Ed.2d 85 (1984)). The circumstances presented here do not require an analysis as to the reasonableness of a search; the action taken by the MCPD was merely assisting appellant in the removal of the boxes of files from his home.

 That a seizure—not involving a search—is *per se* unreasonable under the Fourth Amendment, when it is not pursuant to a warrant supported by probable cause, is subject

to only a few exceptions. *Gamble v. State,* 318 Md. 120, 123, 567 A.2d 95 (1989), citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County, Ill.,* 506 U.S. 56, 68 113 S.Ct. 538, 547 121 L.Ed.2d 450 (1992) (citations and footnote omitted).

The trial court stated that

I believe that the action of the department in requesting the case files was a lawful order, that was complied with by the officer in question delivering the records to the officer who had accompanied him inside—one of the Internal Affairs Division officers.

And so, therefore, the [c]ourt does not believe that the order was coercive or that the options available to the officer were not appreciated one way or the other. It seems clear to me that the officer had the opportunity to do what he wanted to do and, at least, to think about it. It was not an instantaneous decision, but there is some—I do have some reservation in that the directive said, or you may suffer—may suffer administrative sanctions, if you don't comply. People take that different ways, but I think the directive was proper. I think it was reasonable and I think that's the key here, whether this was reasonable or unreasonable, and I think that there was probable cause for the department to ask for the information, and it was delivered, as I take it, voluntarily. So, not having found it to be coercive, I refuse to suppress the search.

In *Gamble,* the trial judge believed testimony that an officer's superior "had done no more than request that [the officer] open the trunk—evidence supported by the sergeant's further testimony that prior to making the request, he had consulted higher authority and had been told that he could not demand entry to the trunk, but should attempt to gain access to it by consent." *Gamble v. State,* 318 Md. 120, 127, 567 A.2d 95 (1989). The trial judge found that the incident "involved no

threat, trickery, force, false reliance on a warrant, or anything of that sort." *Id. Gamble,* relying on the authority of *United States v. Kidd,* 153 F.Supp. 605 (W.D.La.1957), asked the Court to reject the fact-finding of the trial court. *Id.* The *Kidd* Court suppressed evidence found in a trunk of a car because, having been in military custody and having been falsely accused of larceny, Kidd was under a moral compulsion to clear himself and undoubtedly afraid of a court-martial prosecution for insubordination. *Id.* at 128, 567 A.2d 95.

By contrast, Officer Doe was under no such compulsion. He was not under arrest and was not even told the nature of the charges against him. He was instructed only to turn over files that belonged to the MCPD. Indeed the trial judge stated that, under the circumstances, appellant had an opportunity to do what he wanted to do. As the trial judge found and appellant's counsel conceded—appellant "did ask her [Sergeant Lapsley] to go inside with him ... solely for the purpose of carrying boxes." The entry into his premises was therefore voluntary, there was no search conducted and the purported seizure of the files was nothing more than the act of transporting the files from a location—appellant's residence—where they had been maintained as an accommodation by appellant's employer. During the removal of the files, appellant simply complied with a departmental directive, as he was required.

In *Lesher v. Reed,* 12 F.3d 148, 150 (C.A.8 1994), the United States Court of Appeals for the Eighth Circuit considered the police department's contention that the seizure, from the residence of the officer, of a police dog, the ownership of which was claimed by the officer pursuant to an agreement with the department, did not fit within Fourth Amendment framework because there was no search. Alternatively, the department argued no seizure occurred because the officer consented to "a voluntary relinquishment of the dog in response to a direct order from a superior."

Pursuant to a written agreement with the City of Little Rock to donate a dog to the LRPD, Lesher could reclaim

custody and control of the dog if the LRPD determined the animal was unsuitable for police work. The agreement also stated that the LRPD could dispose of the dog if Lesher did not reclaim the animal within a certain amount of time or "for any other good cause shown." *Id.* at 149–50. The dog continued to live with the Leshers until the animal bit a young child. After learning of this incident, the LRPD notified the Leshers that the dog was unsuitable for police work and the LRPD planned to destroy the animal. Lesher responded that he intended to exercise his option to reclaim ownership of the dog. *Id.* at 150. When the officers went to the Leshers' home to remove the dog, Lesher released the animal only after he was informed that he would be relieved of duty if he did not allow the officers to take the dog. *Id.* at 150. He had initially refused the demand on the basis that the dog was his property by virtue of the agreement he had signed with the department. *Id.*

In *Lesher*, the Court held:

The seizure of property is subject to Fourth Amendment scrutiny even though no search has occurred. *Id.* at 68, 113 S.Ct. at 547. Public employees, like private citizens, are entitled to the benefits of the Constitution, and the State may not coerce them into relinquishing a constitutional guarantee under threat of losing their employment. *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation*, 392 U.S. 280, 284–85 n. 5, 88 S.Ct. 1917, 1920 n. 5, 20 L.Ed.2d 1089 (1968). A government employer's seizure of property possessed by an employee is clearly subject to Fourth Amendment restraints. *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987). Although a public employee's Fourth Amendment rights are, to some extent, diminished in the work place, id. at 725, 107 S.Ct. at 1501 ("the privacy interests of government employees in their place of work . . . are far less than those found at home"), a public employee's rights with respect to searches or seizure in his home are no different than a private citizen's. If James were not an LRPD employee, the dog would obviously have been "seized" within the

meaning of the Fourth Amendment. A search or seizure carried out in an individual's home without a warrant is per se unreasonable unless it falls within one of the well-defined exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 474, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971); *see also United States v. Riedesel,* 987 F.2d 1383, 1388 (8th Cir.1993).

*Id.* at 150–51.

At issue in *Lesher* was whether the order to surrender the dog under pain of disciplinary measures was lawful. What was fiercely contested was the ownership of the property to be seized. In fact, it is of no small moment that the police dog had been donated to the LRPD in the first instance. Indeed, a significant question as to the lawfulness of the order was raised by Lesher. Notably, the order at issue here was not directed at retrieval of disputed property or to go to the officer's home to remove the property in question, as in *Lesher. Id.* at 150. The order directed appellant "to produce all case files pertaining to all arrests that you have made in the last 24 months (August 2002—August 19, 2004) in their entirety to include police reports, photographs, tickets/citations, notes and any file evidence." The order further warned that "failure to comply with this order, may result in disciplinary action against you as a result of failing to obey a direct order which is in violation Department Rules . . ." if appellant did not "produce these items immediately without any delay. . . ." No mention is made of where the files might be located and, in view the initial attempt to find them in the file cabinet at the district office, the directive clearly was an order simply to produce the files, wherever they happened to be located.

■ "The governmental interest justifying work-related intrusions by public employers is the efficient and proper operation of the workplace." *Ortega,* 480 U.S. at 723, 107 S.Ct. at 1500. The *Ortega* Court further opined that

[a] standard of reasonableness will neither unduly burden the efforts of government employers to ensure the efficient and proper operation of the workplace, nor authorize arbi-

trary intrusions upon the privacy of public employees. We hold, therefore, that public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable:

> "Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,' *Terry v. Ohio,* 392 U.S. [1], at 20 [88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) ]; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' ibid." New Jersey v. T.L.O., supra[469 U.S. 325] at 341, 105 S.Ct. [733] at 742–743[83 L.Ed.2d 720 (1985)].

*Id.* at 725–26, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714.

The files at issue belong to the MCPD and, thus, it was reasonable for them to demand appellant to produce the files. Thus, the action was justified at its inception. Had the files been located at the district station, the MCPD would have simply taken the files from the cabinet. The circumstances resulting from the accommodation of MCPD in permitting maintenance of files off site precluded the public employer, MCPD, from simply and as acknowledged by all parties, rightfully, taking the files. Reasonableness of the seizure, as considered under the circumstances, dictated that the MCPD demand appellant to produce the files immediately. Appellant's invitation to the officers to enter his residence, simply for the purpose of carrying the boxes out, did not involve an unreasonable seizure as proscribed by the Fourth Amendment.

▮ "As the Supreme Court made unmistakably clear in *Stone v. Powell,* [428] U.S. [465], 96 S.Ct. 3037, 49 L.Ed.2d

1067 (1976), the sole purpose of the exclusionary rule, reluctantly imposed at the cost of probative evidence, is to deter unreasonable police behavior. The ultimate touchstone is reasonableness." *Duncan v. State,* 34 Md.App. 267, 278, 366 A.2d 1058 (1976) (holding that the fruits from an abandoned car were admissible). In this unusual circumstance, where the employer occupies the dual role of government, empowered to exercise the police powers of the state as well as the employer, the acquisition of the files by MCPD was reasonable, given the imperative that a police department be able to perform its public duty consistent with constitutional safeguards designed to protect all citizens.

## SEVERANCE OF CHARGES

In an administrative hearing such as in the case *sub judice,* the agency or board must observe basic principles of fairness. *Coleman v. Anne Arundel County Police Dept.,* 369 Md. 108, 142, 797 A.2d 770 (2002) (holding that "procedural due process in an administrative proceeding 'requires that administrative agencies performing adjudicatory or quasi-judicial functions observe the basic principles of fairness as to parties appearing before them.'") (internal quotations and citation omitted).

Appellants posit that appellees have not explained how the evidence pertaining to Doe's arrest and processing of the individuals would be admissible at hearings on the merits of any of the seven different arrests. Appellants argue that Md.Code Ann., Pub. Safety § 3–108(a)(4)(iii) only provides for consideration of past performance when recommending a penalty after an officer is found guilty of one or more charges. The relevant language provides that "[a] decision, order, or action taken as a result of a hearing under § 3–107 of this subtitle shall be in writing and accompanied by findings of fact. (4) If the hearing board makes a finding of guilt, the hearing board shall: (iii) consider the law enforcement officer's past job performance and other relevant information as factors before making recommendations to the chief." Appellant contends that the same principles that apply to a criminal

proceeding that require severance of the issues apply in the instant case to protect Doe from prejudice.

█ In the criminal context, Maryland Rule 5–404(b) [10] excludes evidence of other crimes, wrongs or acts by a defendant unless the evidence is specially relevant. *Lewin Realty III, Inc. v. Brooks,* 138 Md.App. 244, 260, 771 A.2d 446 (2001), *aff'd* 378 Md. 70, 835 A.2d 616 (2003).

█ The charges against Doe differ from that of a criminal matter. Doe's overall conduct in carrying out his duties as an officer is relevant to the administrative proceeding. Thus, reliance on Maryland rule 5–404 is misplaced and inapplicable to the case at bar. The combination of the charges require the Department to prove its case as to each separate charge. Further, there will be no "other crimes" evidence because all of the charges stem from alleged misconduct in the performance of job duties and, thus, no "other crimes" are involved in the proceeding. Administrative hearings are not equivalent to criminal proceedings. "Nevertheless, '[n]othing in section 730 requires, or suggests for that matter, that it is the equivalent of a criminal proceeding.'" *Meyers v. Montgomery County Police Dept.,* 96 Md.App. 668, 687, 626 A.2d 1010 (1993) (quoting *Widomski v. Chief of Police of Baltimore County,* 41 Md.App. 361, 379, 397 A.2d 222, cert. denied, 284 Md. 750 (1979)).

Appellants, in their brief, argue, "[a]llowing the charges to be joined in a single hearing will also confound Doe's ability to present separate defenses." At trial, Doe's counsel presented similar argument in asking for an *in camera* hearing regarding why severance was required. The trial court based its decision on denying that request on Doe's counsel's argument that as an officer of the court, she was not necessarily correct

---

**10.** Md. Rule 5–404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

in law and appellant's counsel made no effort to further explain. Thus, not having been provided any basis for counsel's request that the hearing be *ex parte,* the trial judge did not abuse his discretion in denying the *ex-parte request of Doe's counsel.*

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**