MONTGOMERY COUNTY DEPARTMENT OF POLICE
*v.*
FRANK W. LUMPKIN ET AL.

[No. 1200, September Term, 1981.]

*Decided May 6, 1982.*

The cause was argued before Liss and Wilner, JJ., and Clayton C. Carter, Associate Judge of the Second Judicial Circuit, specially assigned.

*Bruce P. Sherman, Assistant County Attorney for Montgomery County,* with whom were *Paul A. McGuckian,*

*County Attorney for Montgomery County,* and *Robert G. Tobin, Jr., Deputy County Attorney for Montgomery County,* on the brief, for appellant.

*Allen J. Katz* for appellees.

Liss, J., delivered the opinion of the Court.

This controversy involves the Montgomery County Department of Police, appellant, and Frank W. Lumpkin and nine other officers of the motorcycle traffic enforcement division of the Montgomery Police Department, the appellees herein. The record reveals the following information concerning the dispute: Uniformed officers in the Montgomery County Department of Police are assigned to one of five district stations located in different geographic areas of the county. These police district stations are in Silver Springs, Bethesda, Wheaton/Glenmont, Rockville and Germantown. Major Thomas McDonald is Chief of the Field Services Bureau, which includes the five district stations, as well as SWAT units, school safety patrol, crime prevention and community relations. A police captain at each district station is responsible for defining an overall mission for his particular geographic area, commanding the officers under his control, and exercising administrative control for necessary personnel actions.

The duties of a uniformed patrol officer involve criminal and traffic enforcement utilizing a police cruiser or on foot. Patrol officers work on rotating eight-hour shifts, twenty-four hours a day, and seven days a week. Uniformed traffic officers are predominately assigned to duties involving traffic control, traffic enforcement, and accident investigation. They generally operate police motorcycles, police cruisers, unmarked cars, and radar units in areas with high rates of traffic accidents. The traffic officers usually work eight-hour shifts, between 7 a.m. and 11 p.m., Monday through Friday. A Special Assignment Team (SAT) at each district station is a tactical or dirty clothes unit that is drawn from the manpower of the police district at the discretion of the district captain.

The patrol, traffic, and SAT officers are ranked as Police Officer I (POI), Police Officer II (POII), and Police Officer III (POIII). All police officers of a given rank are in the same merit system class specification and pay grade, independent of their duty assignments. The class specification for a POIII, for example, shows that an officer may be assigned to a large number of other duties, including criminal investigations; and SWAT (Special Weapons and Tactics).

Prior to August 1, 1978, by reason of Montgomery County Personnel Regulations Section 33-7 (c), police officers assigned to motorcycle duty received a hazardous duty pay differential so long as they remained assigned to motorcycle duty and were below the rank of sergeant. This hazardous duty pay differential was terminated for new employees assigned to motorcycle duty as of August 1, 1978. This policy change did not affect officers then assigned to motorcycle duty.

During the summer of 1980, Major McDonald requested the Montgomery County Department of Police Planning Division to "look at the traffic function as it then existed in the department and to prepare a management report for the department on that function." The purpose of the report was to determine the efficiency of the traffic function and to identify if the department "had perhaps too many or perhaps even not enough or perhaps could have been the right amount [of manpower] dedicated to that specialty."

The management report furnished to Major McDonald concluded that:

> In the narrowest view of the utilization of traffic squads, we have determined throughout the Patrol Division 9.7% of deployable manpower is deployed to perform specific tasks, which account for 3.03% of the Patrol Division's work load. We determined the traffic squads accomplish 58.6% of these specific tasks or 1.78% of the Patrol Division's work load. At no time has this audit denied traffic officers perform other tasks which are the primary duties and responsibilities of the shift officers. We recognize

traffic officers are assigned to various details during the year.

The purpose of this audit is to examine *assigned responsibilities* and relationships to the overall work load. In other words, we are examining the actual reasons for having a traffic squad. We are not examining all of the additional activities which they perform.

In our opinion, the department can no longer justify the deployment of 9.7% of our manpower based on 3.03% of our work load. We find the manpower assigned to this traffic squad is not deployed to best address the traffic work load nor to best assist the shifts in addressing the overall work load.

In carrying out this conclusion, the Planning Division recommended certain modifications to the police manpower deployment. Specifically, the recommendations were:

1. The traffic squads be disbanded.
2. The affected personnel be reassigned to the shifts.
3. The additional deployable manpower be utilized at the discretion of the district commanders to address the needs of the districts.
4. The use of motor units in any manner be discontinued.

Major McDonald reviewed the audit and evaluation report and, with the approval of the Chief of Police, decided that "the traffic function as we then knew it not be abolished, but that it be cut back to some extent and that those people being taken out of traffic squads be reassigned to the basic patrol shift."

At the same time Major McDonald was making modifications to the traffic units, significant changes were being made in the Police Department as a result of the rising rate of violent and serious street crime. Prior to March 1, 1981, the Montgomery County police detectives were centralized at Police Headquarters. Effective March 1, 1981, centralized

Crimes Against Property and Crimes Against Persons units were decentralized to detective units at each of the five district stations. All of the patrol officers in the Police Department converted from a four-day work week to a five-day work week. In addition, special assignment teams (dirty clothes squads used on a flexible basis to combat violent crime) were made permanent and the size of these units was doubled. The SAT officers were drawn from the patrol officers in their respective district stations, and, in part, the motorcycle officers reassigned to patrol duties replaced these officers.

On February 23, 1981, the Chief of Police executed Personnel Order 81-3 which implemented a portion of the department's personnel redeployment.

In early February, 1981, Mayor McDonald met with the district commanders to advise them that:

> [W]e were going back to the five-day week, that we were going to expand our SAT capability, and that we were going to cut back on the size of the traffic squads at each district, and they were instructed on the number to cut back from the various districts, and they were told too that they should consider productivity when they made those decisions and that they, as District Commanders, should make the decisions as to who was going to be reassigned from traffic to the shifts.

All of the district commanders, at trial, testified that they attended this meeting in early February, that they were advised of how many people would be removed from their traffic squads, and that productivity was one of the factors to be used in determining the officers to be reassigned to patrol duties. The district commanders had available to them at their district stations the statistics relating to criminal and traffic arrests for each officer, which was routinely used in employee performance evaluations. At trial each of the five captains, who acted as district commanders, testified regarding the duty reassignment of the traffic motorcycle officers in their districts. Each of them testified that the

reassignments were primarily based on productivity, and that the reassignments were not disciplinary actions or for punitive reasons.

Upon being notified of their duty reassignment and the loss of their 5% differential in pay, eleven police officers, through counsel, notified the Chief of Police that they considered these actions punitive in nature and that they desired a hearing before an appropriate board under the provisions of the Law Enforcement Officers' Bill of Rights.[1] Maryland Code (1957, 1982 Repl. Vol.) Article 27, § 730 (a).

The Chief of Police replied that the reassignment of the officers was not a disciplinary action and that the officers were therefore not entitled to a hearing under LEOBR.

The officers thereupon filed a petition in the Circuit Court for Montgomery County requesting the court to order the Police Department to hold hearings under LEOBR to determine whether "reassignment and loss of pay is appropriate in each of the petitioner's cases." The motorcycle officers also filed grievances under the Montgomery County Merit System Grievance Procedure which have been held in abeyance pending the outcome of this appeal.

At trial, the following stipulations were entered:

1. [A]ll 10 remaining Petitioners are Montgomery County policemen and have been Montgomery County policemen for a period of at least two years.

2. [N]one of the Petitioners were in a probationary status as of February 1st, 1981, nor are they in a probationary status as that term is used in the Law Enforcement Officers' Bill of Rights at this time.

3. [A]ll of the officers were on motorcycle duties prior to March 1st, 1981 and that after March 1st, 1981, they were assigned to shift duties at

---

1. One of the officers later withdrew his participation in this case and ten officers remain as appellees.

the same station under the same District Commander . . .

4. After March 1, 1981, the Appellees no longer received the 5% hazardous duty pay.

After hearing all the evidence and considering written trial memoranda from opposing counsel, the trial court, in a written memorandum, stated the issue to be whether a hearing was required to weigh the benefits of flexible management guaranteed under Section 728 (c) of the LEOBR against the procedural due process guarantees of Section 730 (a) of the LEOBR. The trial judge decided that the transfer of the officers on the basis of their productivity was punitive in nature and that a hearing under Section 730 (a) was required. It is from that judgment that this appeal was filed.

Appellant raises two issues to be decided by this appeal:

1. Did the Circuit Court err in ruling that the reassignment of 10 motorcycle officers to automobile patrol duty based on the motorcycle officers' productivity was a punitive action which required a hearing under the LEOBR?

2. Did the Circuit Court err in concluding that the reassignments of police officers based on productivity during a reduction in the size of traffic units was not a valid management determination under Art. 27, § 728 (c)?

We shall consider both of the issues raised by this appeal together. The Law Enforcement Officers' Bill of Rights is found in Maryland Code (1957, 1982 Repl. Vol.) Article 27, §§ 727 through 734 D.

Section 728 (b) delineates with particularity the conditions under which an investigation or interrogation shall be conducted if such investigation or interrogation could lead to disciplinary action, demotion or dismissal.

Section 730 (a) provides:

*Notice; record.* — If the investigation or interrogation of a law-enforcement officer results in the recommendation of some action, such as demotion, dismissal, transfer, loss of pay, reassignment, or

similar action which would be considered a punitive measure, then, except in the case of summary punishment or emergency suspension allowed by § 734 A of this subtitle and before taking that action, the law-enforcement agency shall give notice to the law-enforcement officer that he is entitled to a hearing on the issues by a hearing board. The notice shall state the time and place of the hearing and the issues involved. An official record, including testimony and exhibits, shall be kept of the hearing.

The Court of Appeals, in *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 418 A.2d 1191 (1980),[2] stated the legislative scheme of the LEOBR to be:

Any law-enforcement officer covered by the Act is entitled to its protections during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction. Implicit in § 728's provision that "[w]henever a law-enforcement officer is under investigation . . . by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal" is the assumption that a disciplinary-type complaint has been lodged against the officer — a complaint which, except as otherwise provided in the Act, will be investigated by the officer's law-enforcement agency as a precondition to any recommendation for the imposition of a disciplinary sanction. The procedural safeguards afforded to the officer during the official inquiry into his conduct constitute the heart of the Act's protections. *See Abbott v. Administrative Hearing Board,* 33 Md. App. 681, 366 A.2d 756 (1976). If the investigation results in a recommendation that the officer be disciplined for his conduct, he is entitled to a hearing under § 730. *Moore v.*

2. The Court of Appeals opinion will be laid to rest if the Governor signs HB 1020 which excludes Chiefs of Police from the ambit of the LEOBR. The effect of the bill will be to reinstate this Court's opinion in 43 Md. App. 580, 460 A.2d 660 (1979).

*Town of Fairmount Heights,* 285 Md. 578, 403 A.2d 1252 (1979). If the hearing board recommends the imposition of a disciplinary sanction, the chief of police makes the final determination whether to impose punishment. If he discharges or otherwise disciplines the officer, § 732 authorizes the taking of an appeal to the court, pursuant to Maryland Rule B2 (appeals from administrative agencies). [Footnotes omitted]. [288 Md. at 451-52].

In that case, Robert J. DiGrazia filed a petition against the County Executive of Montgomery County, claiming that he had been removed from his position as Director of the Montgomery County Police Department in violation of the LEOBR and without the benefit of its procedural safeguards. Maryland Code (1957, 1982 Repl. Vol.) Article 27, §§ 727-734 D. The Circuit Court for Montgomery County granted the County Executive's motion for summary judgment on the ground that the petitioner was neither disciplined nor discharged under LEOBR. This Court affirmed in *DiGrazia v. County Executive for Montgomery County,* 43 Md. App. 580, 406 A.2d 660 (1979). The Court of Appeals reversed on the grounds that the trial court erred in granting summary judgment against the petitioner's complaint that he had been deprived of his constitutional rights not to be discharged under § 733 by reason of his lawful exercise of those rights. The Court held that this section was separate and independent of any requirement that an investigation be conducted under § 728.

In each of the appellate decisions called to our attention by the parties to this case the facts indicate an investigation into conduct which resulted in the imposition of disciplinary action as contemplated in § 728.

*Abbott v. Administrative Hearing Board, Prince George's County,* 33 Md. App. 681, 366 A.2d 756 (1976), concerning a violation of discharge of firearm regulations. The hearing board recommended the officer be demoted in rank and suspended without pay for ten days. *Hoyt v. Police Commissioner of Baltimore City,* 279 Md. 74, 367 A.2d 924 (1977),

involved police officers engaged in an illegal strike. The board recommended dismissal. *Commissioner, Baltimore City Police Department v. Cason,* 34 Md. App. 487, 368 A.2d 1067 (1977), involved improper receipt of monies by a police officer. The officer's employment was terminated. *See also Police Commissioner of Baltimore City v. Dowling,* 281 Md. 412, 379 A.2d 1007 (1977); *Mayor & Commissioners of Westernport v. Duckworth,* 49 Md. App. 236, 431 A.2d 709 (1981); *Widomski v. Chief of Police of Baltimore County,* 41 Md. App. 361, 397 A.2d 222 (1979), in each of which specific allegations of wrongdoing were submitted to a hearing board and recommendations of disciplinary action were made by the board.

Our reading of the LEOBR convinces us that in the absence of the applicability of § 733 there must be a threshold investigation or interrogation of a law enforcement officer which results in the recommendation of some action such as demotion, dismissal, transfer, loss of pay, or reassignment, which would be considered a punitive measure, before the officer is entitled to a hearing board as provided in §§ 730-731. The LEOBR subtitle was enacted to assure that certain procedural safeguards would be provided to police officers during any investigation and subsequent hearing which could lead to disciplinary action, demotion or dismissal. *See DiGrazia v. County Executive, supra.* Section 731 (a) specifically provides that any decision of the hearing board shall be in writing and shall be accompanied by findings of fact which shall consist of a concise statement upon each issue in the case. *A finding of not guilty terminates the action.* If a finding of guilt is made, § 731 specifically sets out the procedure as follows:

(a)         * * *         * * *         * * *

If a finding of guilt is made, the hearing board shall reconvene the hearing, receive evidence, and consider the law-enforcement officer's past job performance and other relevant information as factors before making its recommendations to the chief. A copy of the decision or order and accompanying

findings and conclusions, along with written recommendations for action, shall be delivered or mailed promptly to the law-enforcement officer or to his attorney or representative of record and to the chief. The person who may take any disciplinary action following any hearing in which there is a finding of guilt shall consider the law-enforcement officer's past job performance as a factor before he imposes any penalty.

(b) After the disciplinary hearing and a finding of guilt, the hearing board may recommend punishment as it deems appropriate under the circumstances, including but not limited to demotion, dismissal, transfer, loss of pay, reassignment, or other similar action which would be considered a punitive measure.

(c) The written recommendations as to punishment are not binding upon the chief. Within 30 days of receipt of the hearing board's recommendations, the chief shall review the findings, conclusions, and recommendations of the hearing board and then he shall issue his final order. The chief's final order and decision is binding and may be appealed in accordance with this subtitle. Before the chief may increase the recommended penalty of the hearing board, he personally shall review the entire record of the hearing board proceedings, shall permit the law-enforcement officer to be heard and shall state the reason for increasing the recommended penalty.

After careful examination of the record extract in this case and the facts recited therein, we are convinced that in light of the LEOBR subsection the appellees were not entitled to the hearing granted them by the trial court. We do not find that this case involves the disciplinary-type complaints recited in the prior LEOBR cases previously cited in this opinion. It is clear to us that before any officer was affected the police department made a management decision to reduce the size of a particular specialized enforcement unit,

the motorcycle division. The subsequent determination of the specific officers involved in the reduction and transfer was within the powers and authority granted the chief of police under § 728 (c) of Article 27, which states:

This subtitle does not limit the authority of the chief to regulate the competent and efficient oper- .ation and management of a law-enforcement agency by any reasonable means including but not limited to, transfer and reassignment where that action is not punitive in nature and where the chief determines that action to be in the best interests of the internal management of the law-enforcement agency.

As this Court pointed out in *Allgood v. Somerville,* 43 Md. App. 187, 403 A.2d 837 (1979), a hearing board could not properly make a finding of guilty or not guilty when there have been no accusations, complaints, or charges giving rise to termination. It is obvious that the hearing board, if convened, could not be called upon to make a determination as to whether Police Department resources, as indicated by the study previously made, needed to be concentrated into different areas of enforcement and officers reassigned accordingly.

We express no opinion as to whether the Montgomery County Police Department utilized the proper criterion in selecting the officers to be transferred from the motorcycle division on the primary basis of productivity as demonstrated by the number of tickets issued. We are, however, convinced beyond per adventure that the trial court erred when it expressed its opinion on the appropriate use of the hearing board under LEOBR as follows:

The Court suggests, however, that the intention of the LEOBR is not to displace the decisions by managers, but rather to use the hearing board as a vehicle to ensure that management decisions reach the Department goal of efficient operations without minimizing or ignoring the procedural safeguards of those who contribute to achieving the goal.

The evidence indicates that the transfer of the officers was punitive in nature such that a hearing under section 730 (a) is required.

As we perceive the position of the appellees in this case, it is not that the police chief did not have the authority to implement the management decisions he made based on the study, which resulted in the transfer of the ten police officers from motorcycle duty. Their complaint is that the chief's selection of those to be transferred, resulting in a reduction in pay for each of the officers, was based on the unfair and inappropriate criterion of the number of tickets produced by each officer.

We conclude that the transfers were not punitive within the meaning of the LEOBR subsection and that a hearing before a review board is not the appropriate forum for a determination of this complaint. The Montgomery County Merit System Protection Board is the administrative agency which is empowered to determine whether the police chief's actions in this case were in conformity with the personnel regulations for Merit System employees found in the appendix to Chapter 33 of the Montgomery County Code 1972, as amended December 2, 1980. We note that those regulations set out in detail the system for determining performance evaluation and rating of merit employees. We would assume that an appropriate complaint under these regulations would require an individual hearing for each of the officers since the factual situation, as indicated by the record extract, appears to be different in each case.

*Judgment reversed, costs to be paid*
*by appellees.*