*Sheila M. Breck v. Maryland State Police*, No. 13, September Term, 2016

**STATE EMPLOYEE LAW — LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS — DEFINITION OF SECONDARY EMPLOYMENT —** The Law Enforcement Officers' Bill of Rights, codified as Maryland Public Safety Article Title 3, Subtitle 1, prevents law enforcement agencies from prohibiting "secondary employment" by law enforcement officers. Secondary employment for purposes of the Law Enforcement Officers' Bill of Rights means off-duty employment and does not include on-duty overtime. Work in addition to the officer's primary, full-time role that is performed under the supervision of the police department—even when MSP is reimbursed for that work by a third party—is on-duty overtime work, not secondary employment.

IN THE COURT OF APPEALS

OF MARYLAND

No. 13

September Term, 2016

_____

SHEILA M. BRECK

v.

MARYLAND STATE POLICE

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: March 27, 2017

This case addresses the meaning of "secondary employment" as that phrase is used in the Law Enforcement Officers' Bill of Rights ("LEOBR"), codified in Title 3, Subtitle 1 of the Public Safety Article of the Maryland Code. *See* Md. Code Ann., Pub. Safety § 3-101(b) (2003, 2011 Repl. Vol., 2016 Supp.).[1] Under § 3-103(b), Maryland law enforcement agencies may not prohibit law enforcement officers from working secondary employment. Resolution of the dispute in the present case turns on what sort of work comes within the meaning of "secondary employment."

Petitioner in this case is Sheila Breck, formerly a sergeant employed by the Maryland State Police Department ("MSP"). In 2013, she began working overtime, on average three days a month, in a law enforcement capacity securing National Security Agency ("NSA") facilities in Maryland, pursuant to an agreement between MSP and NSA. Ms. Breck's work at NSA was in addition to the 40 hours per week during which she performed her primary duties at MSP.

In March 2014, MSP, pursuant to a practice it had recently developed, informed Ms. Breck that she could no longer work overtime at NSA. Ms. Breck brought a show cause action in the Circuit Court for Baltimore County, pursuant to § 3-105.[2] She alleged that

---

[1] Section 3-103(b) of the LEOBR provides:
   A law enforcement agency:
   (1) may not prohibit secondary employment by law enforcement officers; but
   (2) may adopt reasonable regulations that relate to secondary employment by
   law enforcement officers.
Hereinafter, unless otherwise identified, all statutory references are to the LEOBR.

[2] Section 3-105(a) provides: "A law enforcement officer who is denied a right granted by [LEOBR] may apply to the circuit court of the county where the law enforcement officer

MSP was violating § 3-103(b)(1) by prohibiting her from continuing to work at NSA.  MSP defended on the ground that troopers who work overtime at NSA are not engaged in "secondary employment," as that term is used in § 3-103(b)(1), but rather, "on duty overtime"; consequently, MSP's prohibiting Ms. Breck from working at NSA did not violate § 3-103(b)(1) and was not an unlawful punitive action.

The circuit court dismissed the action and, on appeal, the Court of Special Appeals, essentially agreeing with MSP's argument, affirmed the dismissal in an unreported opinion. *Breck v. Maryland State Police*, No. 1661, Sept. Term, 2014 (filed January 5, 2016).  We agree with the Court of Special Appeals and affirm the judgment of that Court.

I

*The Factual Context*

The present dispute has its roots in a disciplinary action brought against Ms. Breck, in early 2012, charging her with having filed a report containing false information.  Her police powers were suspended pending disposition of that charge.  In May and June 2012, a trial board conducted a hearing[3] and in July 2012 issued written findings determining that she was "guilty" of the charge.  Pursuant to § 3-109, Ms. Breck sought judicial review of

---

is regularly employed for an order that directs the law enforcement agency to show cause why the right should not be granted."

[3] Section 3-107 provides that a law enforcement officer who is the subject of an interrogation or investigation resulting in a recommendation of some form of discipline has the right to a hearing on the issues before a trial board.  If the trial board finally decides that the officer is guilty of one or more of the charges, the trial board may recommend the penalty it feels is appropriate.  The chief of the law enforcement agency reviews the recommendation and issues a final order.  *See* § 3-108.

the trial board's decision in the Circuit Court for Baltimore County. The circuit court did not disturb the decision of the trial board. Ms. Breck noted an appeal to the Court of Special Appeals, which, in an unreported opinion, ordered that the administrative determination be vacated and a new hearing be conducted because the principal witness's testimony could not be located for inclusion in the appellate record.[4] *Breck v. Maryland State Police*, No. 75, Sept. Term 2014 (filed January 22, 2015).

Meanwhile, in 2013, MSP restored Ms. Breck's police powers and, in July of that year, she began working an average of three days a month in an assignment at NSA. As later described at the hearing before the Circuit Court for Baltimore County in the present matter, Ms. Breck's work at NSA was in addition to her regular 40-hour work week at MSP.

On January 7, 2014, MSP management met with Ms. Breck. At that meeting, Lieutenant Colonel William Pallozzi handed Ms. Breck a letter, dated November 5, 2013, addressed to her and signed by Marcus L. Brown, Superintendent of MSP. The body of the letter states:

> Due to recent changes in Maryland law, we have began [sic] the process of reevaluating staffing assignments for those troopers who, like yourself, have an investigative or hearing board finding that could be deemed to involve untruthfulness. This duty has been thrust upon us by changes in the rules governing discovery in criminal cases, specifically MD Rule, 4-263, which requires Assistant State's Attorneys to disclose all impeachable material regardless of whether it is requested. A prior finding on a trooper's

---

[4] A new hearing on the administrative charge was scheduled for September 28, 2015. It is not clear from the record whether that hearing occurred. MSP informs us, however, that the administrative charge ultimately was resolved by agreement and Ms. Breck retired from MSP as of May 1, 2016.

administrative record that could arguably involve untruthfulness and integrity falls into this category.

A recent Court of Appeals opinion, *Fields v. State*, 432 Md. 650 (July 9, 2013), makes it clear that failure to disclose this information is grounds for reversal of criminal convictions. *Fields* involved a murder case in which the primary Baltimore City Detectives involved in the case had previously falsified time sheets. The Court reversed the murder conviction, holding that the fact that the detectives falsified time sheets should have been disclosed to the defense because it "would be probative of the detectives' character for untruthfulness." *Fields,* 432 Md. at 674-675.

What this means is that troopers such as yourself can now have the prior "untruthfulness" finding used against them every time they testify in court. While it is unclear what every State's Attorney will do in this situation, many of them have decided they will not go forward with cases in which one of the primary investigators has this kind of finding on their record.

Regrettably, this situation requires us to place troopers with "untruthfulness" findings into positions in which they will not be called upon to testify in court. We must also instruct you to avoid situations that could result in requiring you to testify in court except for your obligations specified in PER 17.03 X (Neglect of Duty) or PER 13.01 C (Crimes witnessed by Troopers while engaged in Off-Duty Secondary Employment). If you are required to testify in Court, we will be obligated to inform the State's Attorney's Office of the finding on your record and the State's Attorney's Office will make a decision of how to proceed.

We realize that the finding on your record happened some time ago, but the recent changes in the law requires [sic] us to act now. We continue to value you as a member of the MSP family, but now we must have you make your contributions in a different manner. A member of the Senior Staff will meet with you in the near future to discuss this issue.

At the time of the January 7, 2014, meeting, Ms. Breck was working in the Facilities Management Division of the MSP. Her duties in that Division did not include law enforcement.

Following the January meeting, Ms. Breck continued to work overtime shifts at the NSA in a law enforcement role, providing security at that site. In March 2014, Ms. Breck's direct supervisor, David Manning, informed her that, under the new policy (reflected in the letter), she could no longer wear her uniform at any location or portray herself as a police

4

officer; she could not continue working in the law enforcement role at NSA or perform other work that might cause her to testify in court; and, though she could keep her vehicle, the emergency lights and siren would be removed.

Ms. Breck was informed on July 2, 2014, that MSP would be investigating her conduct, pursuant to § 3-104.[5] This investigation arose from a complaint accusing her of disobeying the Superintendent's instructions in his letter delivered to Ms. Breck by Lt. Col. Pallozzi on January 7, 2014, by continuing to perform secondary employment for the NSA until she was told to stop by Mr. Manning on March 26, 2014.

*A Pertinent Amendment to the LEOBR*

In the Spring of 2014, the General Assembly enacted § 3-106.1, as an amendment to the LEOBR. Effective October 1, 2014, § 3-106.1 allows law enforcement agencies to maintain a list of officers who have untruthfulness findings on their record but prohibits punitive action against those officers based solely on their inclusion on the list. That section reads:

> (a) *In general.*
> A law enforcement agency required by law to disclose information for use as impeachment or exculpatory evidence in a criminal case, solely for the purpose of satisfying the disclosure requirement, may maintain a list of law enforcement officers who have been found or alleged to have committed acts which bear on credibility, integrity, honesty, or other characteristics that would constitute exculpatory or impeachment evidence.
> (b) *Punitive action against officers on list prohibited.*
> A law enforcement agency may not, based solely on the fact that a law enforcement officer is included on the list maintained under subsection (a)

---

[5] Section 3-104 sets forth the procedures a law enforcement agency is to follow when conducting an investigation or interrogation of a law enforcement officer concerning possible disciplinary action, demotion, or dismissal.

of this section, take punitive action against the law enforcement officer, including:
(1) demotion;
(2) dismissal;
(3) suspension without pay; or
(4) reduction in pay.
(c) *Notice to officers of name placed on list.*
A law enforcement agency that maintains a list of law enforcement officers under subsection (a) of this section shall provide timely notice to each law enforcement officer whose name has been placed on the list.

*The Present Legal Action*

On July 25, 2014, Ms. Breck filed the present show cause action in the Circuit Court for Baltimore County. In the Complaint to Show Cause,[6] Ms. Breck alleged that MSP had violated §3-103(b) by prohibiting her to engage in such employment, resulting in the "loss of thousands of dollars of wages." She sought in her prayer for relief an order directing MSP, in pertinent part, to show cause why she should not be afforded her right to perform secondary employment pursuant to § 3-203(b); and for entry of "a judgment of $50,000 in favor of her and against MSP." MSP replied with a Response to the Complaint to Show Cause, arguing the Complaint should be dismissed because MSP never denied Ms. Breck a request for secondary employment; the LEOBR does not grant law enforcement officers a right to participate in or be assigned to an overtime assignment; and MSP was immune from suit except as provided in the Maryland Tort Claims Act, which Ms. Breck had not pursued.

On October 6, 2014, the circuit court held a hearing on the Complaint. At the hearing, Ms. Breck asserted a new allegation that MSP had taken punitive action against

---

[6] See *supra*, note 2.

6

her, in violation of then recently-enacted § 3-106.1.[7]

Ms. Breck testified at the hearing that, although MSP prohibited her from working the law enforcement overtime opportunity at NSA, MSP did not prevent her from working off-duty for third parties. She pointed out that she was working at the time of the hearing as a private security guard at a McDonald's restaurant. Ms. Breck testified that her work both at NSA and at the McDonald's are forms of secondary employment.[8] She also testified that, at the conclusion of her January 7, 2014, meeting with Lt. Col. Pallozzi, he informed her that "nothing changes with you." She interpreted those words to mean that she could continue her work at NSA.

Ms. Breck further testified that, on March 26, 2014, she received two telephone calls from her direct supervisor, David Manning. In the first call, Mr. Manning advised her, without explanation, that she "cannot work at NSA anymore." In a later call that same day, Ms. Breck testified that Mr. Manning told her that "he believed that there was a complaint that occurred," and she was no longer to wear her uniform, activate the lights on her police vehicle, or wear anything identifying her as a police officer. Ms. Breck also testified about her interpretation of Personnel Directive PER 13.01 ("Directive"). The six-page Directive, which was issued January 1, 2013, and revised on October 11, 2013, provides, in subsection .03:

EXTRA-DUTY SECONDARY EMPLOYMENT (EDSE): employment that

---

[7] MSP has not argued that Ms. Breck is foreclosed from raising a violation of § 3-106.1(b) based on conduct by MSP that occurred prior to the effective date of that provision.

[8] MSP had no connection to Ms. Breck's work at the third party site and has never challenged it as improper.

7

is supervised by the MSP which includes performing tasks such as escorting oversize and overweight vehicles, State Highway Administration projects and other reimbursable overtime projects when compensation is paid through the MSP.

OFF-DUTY SECONDARY EMPLOYMENT (ODSE): the participation in any activity where compensation is derived from any source other than the MSP including military reserve components and any form of self-employment.

SECONDARY EMPLOYMENT (ODSE): when used alone, includes both extra-duty secondary employment and off-duty secondary employment.

Subsequent provisions of the Directive focus primarily on off-duty secondary employment, addressing such matters as: the procedure for obtaining approval for off-duty secondary employment; the procedure for handling crimes witnessed while working on off-duty secondary employment; the types of employment that will not be approved for off-duty secondary employment; limitations on the amount of overtime permitted in off-duty secondary employment and the amount permitted in extra-duty; and provisions attendant to the employee's informing his commander of the employee's termination of his secondary employment. Ms. Breck testified that she understood the work she performed at NSA to be off-duty secondary employment.

MSP's Director of Human Resources, Don Lewis, testified at the hearing as a witness for MSP. Mr. Lewis described the type of employment Ms. Breck had been performing at NSA as an example of an "on duty, reimbursable overtime project," much like similar projects that MSP has with other state governmental agencies. Mr. Lewis gave the example of MSP's arrangement with the State Highway Administration ("SHA") to provide on-duty trooper escorts when needed. When troopers are assigned to such duty,

8

over and above their regularly assigned duties, they are paid by MSP at an overtime rate, for which, in the case of the example Mr. Lewis provided, the SHA would then reimburse MSP. Mr. Lewis testified that the troopers, while engaged in such on-duty overtime work, "retain full immunity that's provided to any police officer through their State employment."

Mr. Lewis also testified to the details of MSP's arrangement with NSA. MSP provides NSA with troopers in uniform who drive marked police vehicles. Troopers working the NSA detail are supervised by MSP personnel and continue to work their standard 40-hour week at MSP. MSP pays the troopers for their work at NSA at the respective trooper's overtime rate. The additional money is added to the troopers' regular MSP paychecks, attributed to a special accounting code for this type of work. MSP is then reimbursed by the NSA.

Mr. Lewis explained that on-duty overtime, like that outlined in the agreements between MSP and SHA and MSP and NSA, is "extra duty secondary employment." A second type of duty, termed "off duty secondary employment", refers to employment arrangements "between the trooper and a third party entity." The trooper is not paid through the State police payroll and, while working in that off-duty capacity, is "required to act as a private citizen, unless there is . . . a witnessed serious crime, such as a felony." Mr. Lewis added that troopers engaged in off-duty secondary employment are paid directly by the third party and are required to pursue a process that requires the approval of the trooper's commander, in order to undertake such employment. In addition, "[t]he Troopers are permitted to drive their vehicles to and from the secondary employment," as "[c]ontractually, all State Troopers have off duty use of their police cars. But they're not

9

permitted to use it during their secondary employment and the police does require that it be parked in an unobtrusive location." MSP permits troopers "to have their vest and firearm and agency-issued badge with them when they're working these secondary employment projects," but the troopers "are not permitted to wear any part of their uniform" or "identify themselves as Maryland State Troopers while they're working the secondary employment, unless they witness a serious crime."

Following Mr. Lewis's testimony, the court heard closing arguments, then issued its decision:

> [T]his record does not support any finding that there's been any punitive action against Sgt. Breck. Sgt. Breck does have secondary employment, based on her own testimony. I do not find there's been any violation of the Law Enforcement Officer[s'] Bill of Rights on this record.
>
> Sgt. Breck has not demonstrated to this Court on this record at this time that she's entitled to any relief.
>
> The Complaint to show cause is dismissed.

The Court of Special Appeals affirmed the circuit court's dismissal of the Complaint. The intermediate appellate court considered the meaning of secondary employment, as that phrase is used in § 3-103, and concluded:

> [S]econdary employment within the meaning of § 3-103 means off-duty secondary employment and does not include on-duty overtime, identified by MSP as extra-duty secondary employment. Secondary employment within the meaning of § 3-103 means employment directly by a third party, *i.e.*, a party other than the agency for whom the employee primarily works. Extra-duty secondary employment means employment by an officer performing other than his/her primary duties either for the MSP directly or pursuant to a contractual assignment to a third party after the officer has worked 40 hours performing his/her primary duties. The officer is paid overtime compensation by the MSP, and the MSP is reimbursed by the third party. . . .

The directive PER 13.01 is consistent with this conclusion in that, after

10

defining two types of secondary employment, the detailed portion of the directive addresses only off-duty secondary employment. We conclude that the MSP definitions are merely an internal reference to distinguish one type of employment from another.

The Court of Special Appeals further held that MSP did not take unlawful punitive action against Ms. Breck in prohibiting her from working at the NSA, given the untruthfulness finding in her personnel record.

Ms. Breck's petition for writ of certiorari presents four questions, which we have condensed into two:

> Did the Court of Special Appeals err in holding that Ms. Breck's work at NSA was on-duty overtime work, rather than secondary employment protected by § 3-103(b)?

> Did the Court of Special Appeals err in holding that MSP did not take punitive action in prohibiting Ms. Breck from working at NSA?

We answer "no" to both questions.

## II

*Standard of Review*

The questions presented require us to construe and apply two provisions of the LEOBR §§ 3-103(b) and 3-106.1, to the undisputed facts of this case. Those questions are purely legal in nature; therefore, our review is de novo. *Schisler v. State*, 394 Md. 519, 535 (2006).

*What is "secondary employment" as that term is employed in § 3-103(b)?*

The term "secondary employment" is not defined in the LEOBR and, insofar as our research discloses, no reported decision of this Court or the Court of Special Appeals has

11

addressed the meaning of this term or the scope of its application.[9]  We therefore must discern what the General Assembly intended by the words "secondary employment."

To that end, we turn first to the well-settled rules of statutory interpretation.  "[T]he prime objective in construing statutes is to determine and implement the legislative intent." *Evans v. State,* 396 Md. 256, 340-41 (2006).  "Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576 (2005).  If the language used by the General Assembly is clear and unambiguous, we need go no further.  At that point, "the inquiry as to legislative intent ends; we do not then need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.'" *The Arundel Corp. v. Marie*, 383 Md. 489, 502 (2004) (quoting *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 220 (2003)).  "If, however, the meaning of the plain language is ambiguous or unclear, we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Lewis v. State*, 348 Md. 648, 653 (1998).

We have noted that "secondary employment" is not among those terms that are

---

[9] Maryland courts have addressed law enforcement agencies' ability to regulate secondary employment.  In every reported decision on the subject, however, the work at issue was clearly off-duty work performed directly for a third party and unconnected with agency management and operations. *See, e.g., Fraternal Order of Police, Montgomery Cty. Lodge No. 35 v. Mehrling*, 343 Md. 155 (1996) (officer worked as private security guard for an apartment complex); *Howard Cty. Police Officers Ass'n v. Howard Cty.*, 126 Md. App. 319 (1999) (officers worked in security-related function for a retailer).

defined in the LEOBR, *see* § 3-101 ("Definitions"), and, other than § 3-103(b) itself, no section of the LEOBR uses the term or hints at its meaning. All that we know from the plain language of § 3-103(b) is that law enforcement officers have a right to engage in secondary employment and that right is subject to reasonable regulation by the agency. *Fraternal Order of Police, Montgomery Cty. Lodge No. 35 v. Mehrling*, 343 Md. 155, 176 (1996) (declaring that the right to secondary employment is clear from the plain language of § 3-103(b)(1) and it is "equally as clear" that law enforcement agencies have the right to control the extent and form of their officers' secondary employment through "reasonable regulation").

The legislative history underlying the enactment of § 3-103(b) is sparse, but it is worth noting that the iteration of the secondary employment provision first proposed in 1984 was concerned with conflicts of interest, a worry that would not be applicable to on-duty overtime work, which is Department-controlled. *See* Committee Report System Bill Analysis, Senate Judicial Proceedings Committee, House Bill 915 (1984). The original version of the provision stated that secondary employment could be subject to reasonable regulation "as necessary to prohibit a conflict of interest in the performance of the officer's official duties." *Id*. That phrase appears to have been removed following a letter to the Chair of the House Judiciary Committee from the Maryland State Lodge, Inc. of the Fraternal Order of Police ("FOP"). The letter explained that, although the FOP supported a right in law to secondary employment, there was no need to restrain law enforcement agencies with the conflict of interest language, recommending instead that the modifier "reasonable" was sufficient to cabin agency regulations appropriately. The requested

13

amendment was adopted, yet there is no indication that the General Assembly, in making that change, had intended to ignore, among other matters of agency concern, the avoidance of conflicts of interest or other unwanted outcomes to the agency as the result of an employee's engagement in secondary employment. *See also Mehrling*, 343 Md. at 174-76 (reviewing the legislative history of what is now § 3-103(b)).

MSP has not promulgated a formal regulation, set forth in the Code of Maryland Regulations (COMAR), that addresses secondary employment. Instead, the agency issued the Directive, which we outlined earlier in this opinion and was the subject of much discussion at the hearing before the circuit court.[10] The Directive distinguishes between what MSP considers extra-duty secondary employment—that which, at the direction of MSP exceeds the law enforcement officer's normal assignment and over which the MSP has full control and authority—and off-duty employment directly with a third party. We conclude that only the latter is "secondary employment", as that term is used in § 3-103(b)(1), and therefore subject to reasonable regulation under § 3-103(b)(2).

---

[10] At oral argument, the Court questioned MSP's counsel as to why the agency had not promulgated, in COMAR, a formal regulation dealing with secondary employment. Counsel replied that the subject matter is exempt from the formal procedural requirements of the Administrative Procedure Act, *see* § 10-101 *et seq.* of the State Government Article ("SG") ("Administrative Procedure Act—Regulations"), because what is and is not secondary employment, and how it is to be regulated, relates solely to the internal management of MSP and its staff and, as such, does not fall within the ambit of a "regulation", as defined by that subtitle. *See* SG § 10-101(h)(1) and (2) (2014 Repl. Vol., 2015, 2016 Supp.). We agree. *See Evans,* 396 Md. at 348 (explaining that a matter that relates solely to the "internal management of the agency and does not affect public rights" is not governed by the requirements of the Administrative Procedure Act); *see also Massey v. Sec'y, Dep't of Pub. Safety & Corr. Servs.*, 389 Md. 496, 499 (2005) (same).

14

Review of the entirety of the Directive reflects MSP's reasonable regulation of third-party employment. The regulations in large part concern the prevention of conflicts of interest, maintaining the integrity of the agency, and ensuring that its law enforcement officers' third-party, secondary employment does not interfere with their effectiveness in their on-duty work. For example, sections 13.06D(1)(a), (d) and (g) of the Directive prohibit secondary employment that would bring discredit to MSP, employment that results from an officer using the prestige of his public office, and employment by an entity subject to the officer's law enforcement authority. These portions of the Directive have meaning only if understood to apply to off-duty employment with a third party, not on-duty employment—whether it be regular or overtime—that is subject to MSP's direct control and oversight.

In addition, interpreting "secondary employment" to include on-duty overtime work would undermine another key part of the LEOBR, found in § 3-102(c). This section provides:

> [The LEOBR] does not limit the authority of the chief [11] to regulate the competent and efficient operation and management of a law enforcement agency by any reasonable means including transfer and reassignment if:
> (1) that action is not punitive in nature; and
> (2) the chief determines that action to be in the best interests of the internal management of the law enforcement agency.

The provision ensures that law enforcement leadership retains the flexibility and management discretion to run an agency that is responsible for a critical public service.

---

[11] Section 3-101(b) defines "chief" as "the head of a law enforcement agency…. includ[ing] the officer designated by the head of a law enforcement agency."

15

Section 3-102(c) balances the procedural safeguards of the LEOBR with the practicalities of institutional management. And it clarifies that MSP may make any reasonable managerial decision for the benefit of the institution.

This authority is limited by the rights granted to employees in the LEOBR and other statutes. We do not discern here, however, an unreasonable management decision subverting employee rights. MSP made a decision, based on this Court's holding in *Fields v. State*, 432 Md. 650 (2013), and state prosecutors' warning that they may not go forward on cases where a police officer witness is impeachable on veracity, that MSP would not place officers with impeachable records in front-line law enforcement positions. This statutory management authority would be undercut if "secondary employment," as used in § 3-103(b), included on-duty overtime. If that were the case, law enforcement agencies could implement a sensible duty assignment for an officer in her primary role, yet then be bound to place that officer in non-suitable work should she seek it as on-duty overtime. This absurd result cannot be what the legislature intended. In our task of statutory interpretation, we avoid any construction of a statute that would lead to "illogical, absurd, or anomalous results." *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 122 (2014).

Petitioner points out that "secondary employment" as used in the Directive includes both off-duty work for a third party and on-duty overtime, but MSP's use of that term in an internal agency document is neither controlling nor persuasive here. By using "secondary employment" as a catch-all term in the Directive, MSP was likely dealing with confusion that could arise from the two different types of work at issue here that employees may perform in addition to their primary role. Because certain issues of concern to MSP

16

will be equally relevant for both types of work,[12] it makes sense for the Directive's drafter(s) to have used "secondary employment" to pertain to certain circumstances within the Directive as inclusive of both. While it may have been wiser to use words that do not also have special meaning in the statute closely associated with the Directive, MSP's use of those words in the Directive does not change the meaning of secondary employment, as that term is employed in § 3-103(b).

Given the statutory history and context, the case law consistently treating "secondary employment" as off-duty work for a third party, and the need for law enforcement leadership discretion to manage their human resources appropriately, we hold that for purposes of the LEOBR, secondary employment means off-duty work, arranged between the officer and a third party.[13] Applying that construction to the present case, we further hold that MSP did not violate § 3-103(b)(1) by denying Ms. Breck the opportunity to engage in work at the NSA, because such work does not come within the ambit of "secondary employment", as that term is used in that section of the LEOBR.

---

[12] For instance, one prohibition in the Directive prevents officers from taking a sick day excusing them from their primary duties, but then performing overtime or secondary work in the same day. Directive 13.06.A.3. If officers are sick, the State and MSP have an interest in the officers' recovery before returning to work. Additionally, an officer who calls in sick but then reports for what could be higher-paid additional work raises concerns about the officer's truthfulness. These considerations apply equally to both types of additional work. Another example from the Directive is § 13.06.F.5, which prohibits employees from working a maximum of 16 consecutive hours when combining their primary duties with additional work. This rule helps ensure that an employee has time to rest and sleep before reporting for work, a common sense rule that applies equally to on-duty overtime work and off-duty work for a third party.

[13] We have no need in the present case to determine whether "self-employment" would also come within the meaning of secondary employment, as the term is used in § 3-103(b).

17

*Was MSP's direction that Ms. Breck would no longer be eligible for the on-duty law-enforcement related overtime assignment at NSA punitive action prohibited by § 3-106.1(b)?*

At the hearing before the circuit court, Ms. Breck argued that MSP's directive that she no longer wear her uniform or operate an emergency vehicle with lights and siren, which rendered her ineligible to participate in overtime security-related work at NSA, was "punitive action" prohibited by § 3-106.1. For convenience, we restate the text of that section:

> (a) *In general.*
> A law enforcement agency required by law to disclose information for use as impeachment or exculpatory evidence in a criminal case, solely for the purpose of satisfying the disclosure requirement, may maintain a list of law enforcement officers who have been found or alleged to have committed acts which bear on credibility, integrity, honesty, or other characteristics that would constitute exculpatory or impeachment evidence.
> (b) *Punitive action against officers on list prohibited.*
> A law enforcement agency may not, based solely on the fact that a law enforcement officer is included on the list maintained under subsection (a) of this section, take punitive action against the law enforcement officer, including:
> (1) demotion;
> (2) dismissal;
> (3) suspension without pay; or
> (4) reduction in pay.
> (c) *Notice to officers of name placed on list.*
> A law enforcement agency that maintains a list of law enforcement officers under subsection (a) of this section shall provide timely notice to each law enforcement officer whose name has been placed on the list.

The record does not support Ms. Breck's argument. No evidence was introduced in the circuit court that MSP has a "list" of officers with integrity violations or that Ms. Breck was included on it.

Beyond that, even if MSP had created such a list, and Ms. Breck's name was on it,

we fail to see how MSP's action here would have violated the statute through an unlawful "punitive action", as Ms. Breck alleges. The action to which she refers is MSP informing her that, because of her integrity violation, she no longer was permitted to wear her uniform at any location or portray herself as a police officer, or use an emergency vehicle with lights and siren, rendering her ineligible to work in the overtime security assignment at NSA.

In considering this issue, we again look to § 3-102. That section provides:

> [The LEOBR] does not limit the authority of the chief to regulate the competent and efficient operation and management of a law enforcement agency by any reasonable means including transfer and reassignment if:
> (1) that action is not punitive in nature; and
> (2) the chief determines that action to be in the best interests of the internal management of the law enforcement agency.

We agree with the Court of Special Appeals in *Chief, Baltimore County Police Dep't v. Marchsteiner* that no bright-line rule exists that distinguishes actions that are "punitive" from those that are reasonable management decisions. 55 Md. App. 108 (1983). And, "[i]t is probably not feasible to fashion a simple litmus test for determining whether any given personnel action of a law-enforcement agency falls within the punitive category. The law in this area must be developed on a case-by-case basis, with due regard to the particular facts of each situation." *Id.* at 117.

The courts have engaged repeatedly in this fact-based inquiry. In *Marchsteiner*, the petitioner was an officer assigned to the Youth Services Division of the Baltimore County Police Department. *Id.* at 110. After serving successfully in that role for several years, his performance deteriorated. He expressed a poor attitude and initiative, and was subject to multiple complaints that he used foul and abusive language when engaging with the youths

in his charge. After attempts at counseling, police department management involuntarily transferred Marchsteiner to patrol duty. *Id.* at 110-12. Marchsteiner claimed that was punitive action, taken without observing the procedural protections afforded under the LEOBR. The Court of Special Appeals held that the transfer was not punitive. *Id.* at 117. While complaints were made about Marchsteiner, there was no investigation or inquiry beginning an administrative process towards formal discipline. "The complaints were not the essential, motivating events" for the transfer, but rather part of the factual context used by the agency in "an effort to place Marchsteiner where his abilities could be used for the benefit of the law enforcement agency, rather than to its detriment." *Id.* at 117. The transfer was a managerial decision intended "to enhance departmental effectiveness, and to improve Marchsteiner's own performance, not to punish him." *Id.* at 118.

Similarly, in *Montgomery County Dep't of Police v. Lumpkin*, 51 Md. App. 557 (1982), the Court of Special Appeals held that an agency decision to transfer motorcycle unit officers to another division based on their productivity was a managerial action, not a punitive action. *Id.* at 569. In that case, the police department undertook an agency-wide resource assessment, the results of which showed an overinvestment in traffic squads. *Id.* at 559-60. At the same time, the agency was confronting a rise in violent and serious street crime. *Id.* at 560. To address this resource assessment finding and the urgent issue of increasing crime, the agency made multiple officer transfers including the reassignment of several motorcycle officers to basic patrol. *Id.* at 561-62. One of the factors considered in reassignment was the relative productivity of motorcycle officers; more productive employees were more likely to keep their assignment, which included 5% hazard pay. *Id.*

20

The transferred officers challenged the action as punitive, but the Court of Special Appeals disagreed, holding that "the police department made a management decision to reduce the size of a particular specialized enforcement unit, the motorcycle division. The subsequent determination of the specific officers involved in the reduction and transfer was within the powers and authority granted the chief of police." *Id.* at 567-68.

*Leibe v. Police Dep't of the City of Annapolis*, 57 Md. App. 317 (1984), also involved whether an agency action was punitive or managerial in nature. Leibe had been promoted to patrolman first class, subject to a probationary period, but over the months following his promotion was rated "below average" on some performance measures and was suspected of misusing sick leave. *Id*. at 319-20. After reviewing his performance during the probationary period, agency management rescinded his promotion. Leibe challenged the rescission as a punitive action taken without the procedural safeguards of the LEOBR. *Id.* at 320. The trial court disagreed, finding:

> [T]he actions of the [police department] in demoting [Leibe] were *supervisory and administrative, not investigatory and punitive, in nature.* The demotion was not punishment for any wrongdoing nor the result of a disciplinary type complaint and investigation. The demotion was an exercise of the Chief's power and responsibility to effectively and efficiently operate the law enforcement agency.

*Id.* (emphasis in original). The Court of Special Appeals affirmed, holding that the rescission of Leibe's promotion was an allowable exercise of management discretion, not an investigation leading to potential disciplinary action. *See id*. at 323. The Court of Special Appeals explained that the procedural protections of the LEOBR only apply where an investigation potentially leading to punitive action has occurred, and the agency's

21

routine managerial performance review and its administrative tracking of sick leave usage did not constitute an "investigation" in any usual sense of the term. *Id*. at 322-23.

These cases, taken together, teach that the resolution of what constitutes a punitive action turns on the agency's motivation for that action. If based on an investigation and hearing process addressing an alleged wrongful act, potentially leading to punishment for that act, the action is punitive. But if based in the pursuit of sensible agency administration in the best interests of the internal management, the action is managerial, not punitive. A useful marker in this inquiry is whether the agency has acted in a quasi-judicial role (performing an administrative investigation and hearing process) or in its native executive role (routine management of the human resources of the governmental unit to achieve maximum efficiency and effectiveness in its public mission).

Nothing in the legislative history of § 3-106.1 suggests that "punitive action", as that term is used in that section, means anything other than the meaning given to it in applying § 3-102. We note, too, that § 3-106.1 directly addresses the holding in *Fields* by allowing law enforcement agencies to create a list of officers with untruthfulness findings solely for the purpose of disclosing the information to defense counsel for impeachment or exculpatory purposes. *See* § 3-106.1(a). The purpose of the prohibition on punitive action appears to be prevention of any disciplinary action beyond that which is formally decided, and formally appealable, through the administrative discipline process. Forms of discipline tied solely to appearing on the list are prohibited. In essence, this rule prevents an officer from being punished twice for the same violation. This does not mean, however, that MSP cannot make reasonable management decisions regarding work assignments based on the

abilities of the officer and the needs of the agency.

Here, MSP's motivation for not assigning Ms. Breck to front-line law enforcement activities was reasonable and reflected a common sense approach to the best use of MSP's resources. State prosecutors, also reflecting on the best use of their resources, advised MSP that they might not proceed with cases in which the police officer witness is impeachable for veracity. To put Ms. Breck or similarly-situated officers in front-line law enforcement positions could jeopardize otherwise viable criminal cases. MSP reacted to this mission-critical concern reasonably, by using such officers in desk jobs. "It was an effort to place [the police officer] where [his or her] abilities could be used for the benefit of the law enforcement agency, rather than to its detriment." *Marchsteiner*, 55 Md. App. at 117. This was a decision made entirely in agency leadership's executive role, separate from the prior quasi-judicial investigation and hearing into the allegations of untruthfulness against Ms. Breck.

MSP's decision to keep Ms. Breck from front-line law enforcement was a management decision prompted by MSP's institutional needs and Ms. Breck's finding of untruthfulness, not a decision intended to punish Ms. Breck for her acts already addressed in a separate process. Based on a reasonable management motive, it was not a punitive action.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

23